UNITED STATES of America,
Plaintiff–Appellee,

v.

James DOUGLAS, Martin L. Pruitt,
Leon Mason, Defendants–Appellants.

Nos. 88–1259, 88–1260, 88–1333
and 88–2775.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1988.

Decided April 21, 1989.

James Evans, Evans & Froehlich, Champaign, Ill., Julie H. Friedman, Chicago, Ill., Michael J. Higgins, Willowbrook, Ill., for defendants-appellants.

Frances C. Hulin, U.S. Atty's Office, Danville, Ill., for plaintiff-appellee.

Before WOOD, Jr., EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.[*]

HARLINGTON WOOD, Jr., Circuit Judge.

A jury, for the second time, convicted James Douglas, Leon Mason, and Martin Pruitt of conspiracy to possess with intent to distribute and to distribute heroin and cocaine in violation of 21 U.S.C. § 846. On appeal all three challenge their convictions, alleging violation of the Double Jeopardy Clause of the Fifth Amendment and numerous trial court errors. We affirm all three convictions.

## I. FACTS

Although this case involves only a "street-level" drug distribution conspiracy, the facts are somewhat complicated, particularly in light of its procedural history. We therefore recount only minimal factual details, providing further elaboration as the need arises.

On June 2, 1986, a jury convicted Douglas, Mason and Pruitt, along with James Anderson and Cindy Klaman,[1] of conspiracy to possess with intent to distribute and to distribute heroin and cocaine. Those convictions arose out of the same set of operative facts that gave rise to the convictions now on appeal. The defendants and Anderson appealed their first convictions to this court, and on May 6, 1987 we vacated their convictions and remanded the case for

---

[*] This opinion was circulated among all judges of this court in regular active service pursuant to Circuit Rule 40(f). No judge favored a hearing *en banc* on the question of adopting a new court policy governing our review of evidentiary sufficiency in criminal trials.

1. Anderson and Klaman are not involved in this appeal.

a new trial.[2]  *United States v. Douglas,* 818 F.2d 1317 (7th Cir.1987) (*Douglas I*).

The defendants and Anderson were retried, before a jury, and again found guilty on September 25, 1987. Douglas and Mason were sentenced to fifteen years custody, Pruitt to nine years—the same sentences which were imposed after their original convictions.[3] This appeal arises out of these reconvictions.

Although there was some variation in evidentiary detail between the defendants' first trial and their second, the essential facts remained constant. The key members of the charged conspiracy consisted of Jose "KiKi" Castro, a long-time distributor of cocaine and heroin in the Chicago area; Herman Franklin, a Chicago resident and heroin addict who had formerly lived in Danville, Illinois and was a daily customer of Castro; Junior Ray Duckworth, originally a Danville customer of Castro who later moved to Chicago and became a key player in Castro's drug distribution operation; and the defendants, who were the alleged conduits through which Castro distributed heroin and cocaine in the Danville area.[4]

Franklin introduced Duckworth, Anderson and Mason to Castro between the fall of 1983 and the summer of 1984, the time period covered by the charged conspiracy. Anderson in turn introduced Douglas to Castro during the same time period. Pruitt apparently became involved in the conspiracy through Duckworth. On multiple occasions, Douglas, Mason and Pruitt separately purchased one-half to one ounce quantities of cocaine and heroin from Castro and/or Duckworth. Most of these transactions were at least partially on credit.

The procedure involved taking the drugs on credit, with payment to be made at the time of the next pickup or delivery. Mason and Douglas bought from Castro in Chicago, making trips to his home, with only one to two weeks between trips. Eventually Mason and Douglas stopped coming to Castro's home, and Castro began making trips to Danville, both to collect the money Mason and Douglas owed and to deliver drugs to other buyers. It was on these trips to Danville that Pruitt bought drugs from Castro and Duckworth at Pruitt's mobile home in Danville. The conspiracy crumbled not long after these trips began when Castro and Duckworth were arrested for selling cocaine to an undercover drug agent from the Danville Metropolitan Enforcement Group (MEG).

It was never alleged or proven at trial that Douglas, Mason and Pruitt knew each other or had any drug dealing business with each other. Their only proven relationship to one another was that they each were buying drugs on credit from Castro, or owed Castro money for drugs bought on credit, during roughly the same time period. Further, there was no direct evidence that Douglas, Mason or Pruitt actually distributed the drugs they bought from Castro. There was evidence, however, that during the time these defendants were buying drugs on credit from Castro, Douglas sold drugs and gave drugs away as a quid pro quo, Mason offered a woman money to hold "packages" for him and later threatened her unless she paid him for a "pack-

2. Klaman filed a timely notice of appeal from her conviction, but she later requested that we dismiss her appeal. The record reveals no further challenges by Klaman of her conviction. She was not involved in the second trial of the other defendants.

3. The circumstances of Anderson's conviction and sentence will not be further detailed. His appeal was not consolidated with those of Douglas, Mason and Pruitt for reasons not pertinent to the disposition of the present case.

4. Castro was arrested along with his wife, Duckworth and Duckworth's wife in Danville on July 11, 1984. Castro was convicted of distributing heroin and sentenced to 15 years in prison. He testified before the grand jury that indicted the defendants and at both trials. He stated the government made no promises to him for his cooperation. Herman Franklin, an unindicted coconspirator, testified before the grand jury and at both trials against the defendants. It appears that no promises of leniency or immunity were offered to him in return for his cooperation, but see *infra,* at 1160–61. Junior Ray Duckworth pleaded guilty to distribution charges and was given a 15–year sentence. That sentence was later reduced to 10 years in return for his cooperation in the prosecution of the defendants.

age" she no longer had, and Pruitt indicated to Duckworth that he could "get rid of" the cocaine Castro was providing.

The defendants contend that these facts, adduced at both trials, prove only the existence of a mere buyer-seller relationship between each of them and Castro, and that such evidence is insufficient to support their convictions of conspiring to possess with intent to distribute and to distribute cocaine and heroin. The defendants raised this same issue on their first appeal but we declined to address it, even upon a petition for rehearing, vacating the original convictions instead on the basis of an error in the jury instructions. Our failure to address this issue on the first appeal forms the basis of the defendants' double jeopardy claim.

## II. ANALYSIS

### Double Jeopardy

Only Mason and Pruitt challenge their convictions at the second trial on the basis of double jeopardy. Their argument is essentially this: On appeal from their first convictions each claimed that the trial judge erred in refusing to give a jury instruction stating the defendants' theory of defense, and as a matter of law, the government presented insufficient evidence to support the defendants' convictions. This court held in favor of the defendants on the jury instruction issue, vacated their convictions, and remanded for a new trial. *Douglas I*, 818 F.2d 1317. We declined to rule on the sufficiency of the evidence claim. *Id.* at 1320 n. 2. The defendants filed a motion requesting that the court decide the sufficiency question; we construed this motion as a petition for rehearing and denied it. Defendants were thereafter retried and convicted. The defendants claim that we were required to address the sufficiency of the evidence on the first appeal, and that our failure to do so subjected them to double jeopardy in violation of the Fifth Amendment.

This court has never directly addressed the question of whether the Double Jeopardy Clause requires us to review the sufficiency of evidence offered at trial when a defendant raises the issue on appeal. A number of other circuits have held that a reviewing court *cannot* refuse to address a defendant's challenge to the sufficiency of the evidence offered at trial. *See, e.g., Vogel v. Commonwealth of Pennsylvania,* 790 F.2d 368, 376 (3d Cir.1986); *United States v. Hodges,* 770 F.2d 1475, 1477 (9th Cir.1985); *United States v. Bibbero,* 749 F.2d 581, 585–87 (9th Cir.1984), *cert. denied,* 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985); *United States v. Morris,* 612 F.2d 483, 492 (10th Cir.1979).

These decisions are based primarily upon a broad reading of *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). In *Burks,* the Supreme Court explained and modified the rule established in *United States v. Ball,* 163 U.S. 662, 672, 16 S.Ct. 1192, 41 L.Ed. 300 (1896), that the Double Jeopardy Clause does not bar retrial of a defendant who succeeds in having a conviction set aside on appeal. After tracing the Double Jeopardy Clause's somewhat tortured and inconsistent history, the Court in *Burks* limited the *Ball* rule to cases where the reversal of conviction is based upon *trial error. Burks,* 437 U.S. at 14–15, 98 S.Ct. at 2148–49. Where a defendant obtains a reversal on the basis of evidentiary insufficiency, however, the Double Jeopardy Clause does bar retrial. *Id.* at 18, 98 S.Ct. at 2150–51.

The Court explained *Burks* most recently in *Lockhart v. Nelson,* — U.S. ——, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988):

> *Burks* was based on the view that an appellate court's reversal for insufficiency of the evidence is in effect a determination that the government's case against the defendant was so lacking that the trial court should have entered a judgment of acquittal, rather than submitting the case to the jury. Because the Double Jeopardy Clause affords the defendant who obtains a judgment of acquittal at the trial level absolute immunity from further prosecution for the same offense, it ought to do the same for the defendant who obtains an appellate determination that the trial court *should* have entered a judgment of acquittal.

*Lockhart,* 109 S.Ct. at 290 (emphasis in original; citations omitted). In other words, "a reversal on the insufficiency of the evidence ... is the constitutional equivalent of an acquittal" barring retrial under the Double Jeopardy Clause. *Webster v. Duckworth,* 767 F.2d 1206, 1214 (7th Cir. 1985), *cert. denied,* 475 U.S. 1032, 106 S.Ct. 1242, 89 L.Ed.2d 350 (1986).

Mason and Pruitt would have us read into this rule a requirement that whenever a defendant challenges a conviction upon the grounds of insufficient evidence, a reviewing court *must* address that issue. The Supreme Court, however, has never held that a reviewing court must review the sufficiency of the evidence whenever a defendant raises the issue on appeal. In fact, the Court held in *Richardson v. United States,* 468 U.S. 317, 323, 104 S.Ct. 3081, 3084–85, 82 L.Ed.2d 242 (1984), that at least where a first prosecution ends in a mistrial or hung jury, a defendant is not entitled to a review of the sufficiency of the evidence presented at trial before a second trial on the same charges begins. "*Burks* simply does not require that an appellate court rule on the sufficiency of the evidence because retrial *might* be barred by the Double Jeopardy Clause." *Richardson,* 468 U.S. at 323, 104 S.Ct. at 3084–85 (emphasis added). The Court reached this conclusion despite the fact that the first prosecution in *Richardson* derailed only after the close of all the evidence and the jury reported it was unable to reach a verdict.

This is not to say that Mason and Pruitt's argument is without merit. At least four of the nine justices currently on the Court support the proposition that where a first trial results in conviction, as here, an appellate court cannot reverse the conviction because of trial error and decline to review the sufficiency of the prosecution's evidence, at least where the defendant raises the issue.

[W]hen a defendant challenging his conviction on appeal contends both that the trial was infected by error and that the evidence was constitutionally insufficient, the court may not, consistent with the rule of *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), ignore the sufficiency claim, reverse on grounds of trial error, and remand for retrial. Because the first trial has plainly ended "retrial is foreclosed by the Double Jeopardy Clause if the evidence fails to satisfy the [constitutional standard for sufficiency]. Hence, the [sufficiency] issue cannot be avoided; if retrial is to be had, the evidence must be found to be legally sufficient, as a matter of federal law, to sustain the jury verdict."

*Justices of Boston Municipal Court v. Lydon,* 466 U.S. 294, 320–21, 104 S.Ct. 1805, 1819–20, 80 L.Ed.2d 311 (1984) (Brennan, J., concurring in part and concurring in the judgment, joined by Marshall, J.) (quoting *Tibbs v. Florida,* 457 U.S. 31, 51, 102 S.Ct. 2211, 2223, 72 L.Ed.2d 652 (1982) (White, J., dissenting, joined by Brennan, J., Marshall, J. and Blackmun, J.)).

■ While we recognize the logical and legal merit of this analysis, we are not convinced, in light of *Richardson,* that the Double Jeopardy Clause compels an appellate court to review the sufficiency of the evidence offered at trial anytime a defendant raises the question. We are, nevertheless, in order to accomplish the same purpose, prepared to adopt a policy in this circuit of routinely addressing evidentiary sufficiency in criminal cases when a defendant presents the issue on appeal. We need not anchor this policy in the Double Jeopardy Clause; rather its rationale lies in our concern for the preservation of scarce and costly resources. All retrials involve duplicative efforts by judges, juries, prosecutors and defendants, at considerable expense in time and money to all, and in anxiety to the defendant. If in fact insufficient evidence is presented at a first trial, a retrial, on any basis, ordinarily may be expected to be a wasted endeavor. If we find, however, that the evidence is sufficient to sustain a conviction, but reverse based on trial error, a retrial can be had under the standards articulated in *Ball* and *Burks.*

■ Adoption of this rule does not alter the status of the defendants in the present

case. We hold that the evidence presented against Mason and Pruitt at their first trial was in fact sufficient to support their convictions. We reach this conclusion after a full review of the record on appeal in the first trial (including the full trial transcript) and the briefs of the parties on the first appeal. Because there was sufficient evidence presented against them at their first trial, our failure to evaluate the evidence on the first appeal, and the subsequent retrial of the defendants, did not subject Mason and Pruitt to double jeopardy.

### Sufficiency of the Evidence at the First Trial

A defendant challenging his conviction on the grounds of insufficient evidence bears a heavy burden. The standard of review dictates that the evidence presented at trial, and all reasonable inferences that can be drawn from that evidence, be viewed in the light most favorable to the government. *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989). If *"any* rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt," we must affirm. *Jackson v. Virginia*, 443 U.S. 307, 308, 99 S.Ct. 2781, 2783, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Grier*, 866 F.2d 908, 922 (7th Cir.1989). Under this standard, we give "deference to the jury's weighing of the evidence and its drawing of reasonable inferences." *United States v. Draiman*, 784 F.2d 248, 251 (7th Cir.1986). Furthermore, the credibility of witnesses is left solely to the jury's evaluation, unless there are extraordinary circumstances. *United States v. Muskovsky*, 863 F.2d 1319, 1322 (7th Cir.1988). "Only when the record contains *no* evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *Nesbitt*, 852 F.2d at 1509 (quoting *United States v. Whaley*, 830 F.2d 1469, 1472 (7th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988)).

Mason and Pruitt claim that the government presented insufficient evidence at their first trial to convict them of conspiracy to possess with intent to distribute and to distribute cocaine and heroin. They allege that at most the government proved that each had, on more than one occasion, purchased small quantities of cocaine and heroin from Castro or Duckworth. Mason and Pruitt claim that these quantities were consistent with mere personal use and that the government offered no direct evidence that either of them further distributed the drugs. They argue that intent to distribute cannot be inferred from mere possession of controlled substances, unless the quantity is substantial or there is other evidence supporting the inference of intent to distribute, such as possession of scales or other drug distribution paraphernalia. *See, e.g., United States v. Franklin*, 728 F.2d 994, 998–99 (8th Cir.1984) (collecting cases).

■ Mason and Pruitt are correct that proof of a mere buyer-seller relationship, without more, is insufficient to support a drug conspiracy conviction. "The mere agreement of one person to buy what another person agrees to sell, standing alone, does not support a conspiracy conviction." *United States v. Mancillas*, 580 F.2d 1301, 1307 (7th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978), *quoted in United States v. Koenig*, 856 F.2d 843, 854 (7th Cir.1988). *See also Douglas I*, 818 F.2d at 1321. If the government offered nothing more at the first trial than evidence of a mere buyer-seller relationship between the defendants and Castro and Duckworth, then the evidence would have been insufficient to support Mason's and Pruitt's original convictions. Mason's and Pruitt's view of their initial trial is flawed however. They overestimate the quantum and method of proof required in a drug conspiracy case, and ignore much of the evidence presented.

A conspiracy is nothing more than a "combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *Whaley*, 830 F.2d at 1473 (quoting *United States v. Herrera*, 757 F.2d 144, 149 (7th Cir.1985)). To prove a con-

spiracy under 21 U.S.C. § 846 the government must establish "the existence of an agreement between two or more individuals, with the intent to commit an offense in violation of the Controlled Substances Act." *United States v. Griffin*, 827 F.2d 1108, 1116 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1085, 99 L.Ed.2d 243 (1988) (quoting *United States v. Sweeney*, 688 F.2d 1131, 1140 (7th Cir.1982)). Proof of these essential elements may be by circumstantial evidence, for "circumstantial evidence is of equal probative value to direct evidence." *Griffin*, 827 F.2d at 1116 (quoting *United States v. Marquardt*, 786 F.2d 771, 780 (7th Cir.1986)). Further, a conspiracy, "by its very nature ... is conceived and carried out clandestinely, and direct evidence of the crime is rarely available." *Nesbitt*, 852 F.2d at 1510. Once the existence of a conspiracy is proven only very slight evidence is needed to establish a defendant's membership in the conspiracy. *Whaley*, 830 F.2d at 1473 (collecting cases). In the end, the evidence "need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt." *Koenig*, 856 F.2d at 854 (quoting *United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986)). We now examine in turn the evidence presented against Mason and Pruitt at their first trial.

*Mason's First Trial*

■ Although the government presented no direct evidence that Mason actually distributed the drugs he acquired from Castro, the government presented sufficient circumstantial evidence from which a rational jury could conclude that Mason was a member of a conspiracy, the object of which was clearly drug distribution. This is sufficient to sustain a drug conspiracy conviction. *See, e.g., Koenig*, 856 F.2d at 854–55. Even if the relationship between the accused and the other members of the conspiracy is that of buyer-seller, as Mason alleges, "a conspiracy may yet be proved by evidence of a concert of action." *Id.* at

854; *United States v. Creamer*, 555 F.2d 612, 615 (7th Cir.1977). "An ongoing relationship involving the distribution of drugs is evidence of a concert of action." *Koenig*, 856 F.2d at 854; *Mancillas*, 580 F.2d at 1307.

The evidence adduced at the first trial, viewed in the light most favorable to the government, established that Mason had an ongoing relationship with several members of the Castro conspiracy. As noted earlier, Castro himself, the hub of this conspiracy, was a drug dealer in Chicago for many years who began selling drugs to Danville, Illinois residents in 1983. Herman Franklin, an unindicted coconspirator, introduced Castro to a number of these Danville connections, including Mason.[5]

During the time period covered by the charged conspiracy, Mason regularly traveled to Castro's home in Chicago to buy half-ounce and one-ounce packages of cocaine and heroin. He purchased drugs from Castro as many as 10 or 12 times during 1983 and 1984. The pattern of these drug transactions reveals that Mason began by purchasing these half-ounce to one-ounce quantities of drugs approximately every two weeks, paying the full purchase price in cash at the time of delivery. By the third or fourth purchase, however, Castro began "fronting" drugs to Mason, meaning Mason took the drugs on credit and would pay for them on his next visit. At one point, Mason left a car with Castro as security for an ounce of cocaine he bought totally on credit. Mason returned approximately four days later, paid Castro the $2000 owed and took another ounce of cocaine and an ounce of heroin on credit. Although Mason offered to leave the car as security again, Castro declined the offer, saying he "trusted" Mason for the money. As it turned out Castro's trust was misplaced; Mason never returned to pay off this last Chicago purchase.

In the spring of 1984, Castro began making trips to Danville with other members of the conspiracy,[6] delivering drugs to Dan-

---

**5.** Mason met Castro at the Danville home of Robert Franklin, Herman Franklin's nephew, sometime in 1983. Castro was making a two-ounce cocaine sale to Robert Franklin.

**6.** These trips included various permutations of

ville customers and attempting to collect money from Mason and Douglas. Although he looked frequently and widely for Mason, the search proved fruitless. Castro did locate Mason's girlfriend, Cindy Klaman, at the address Mason had given him. Castro fronted drugs to Klaman on this occasion, but refused to sell to her again when she failed to pay him. According to Castro, Mason still owed him $6000 at the time of Mason's trial.

Junior Ray Duckworth testified that he went with Castro on these trips to Danville and that he helped distribute drugs and collect money owed. Duckworth had begun his relationship with Castro by buying half-ounce quantities of cocaine to resell. He later became Castro's right-hand man in the conspiracy. Duckworth testified that the drugs he and Castro sold were never packaged for street-level distribution but were sold in bulk; it was up to the buyer to repackage. Duckworth knew Mason, had seen him at Castro's house in Chicago and had been with Castro on the trips made to Danville looking for Mason, although he never directly distributed drugs to Mason. Duckworth's wife, Jeanne, also knew Mason and saw him at Castro's house in Chicago in 1984.[7]

Another witness, Sally Young, testified that in April 1984, Mason claimed ownership of and demanded payment of $250 for a missing "package" that had been given to Young by one Anthony Johnson. The "package" contained one-eighth ounce of a white powder. She also stated that about one month before this incident Mason told her she could make money simply by holding "packages" for him.[8]

In addition to the testimony of these witnesses, the government introduced telephone records that showed an inordinate amount of activity between Mason's telephone number and Castro's number from December 1983 to June 1984.[9]

We cannot say, viewing all the evidence produced at Mason's first trial (and all reasonable inferences therefrom) in the light most favorable to the government, that a rational jury could not properly conclude that Mason was a member of the conspiracy charged. While any single piece of evidence, standing alone, might have been insufficient to establish Mason's participation in the Castro drug conspiracy, a rational jury could infer from the totality of the evidence—the fronting arrangement, the packaging of the drugs Castro sold to Mason, the use of others to hold "packages," the inordinate telephone activity—that the relationship between Mason and Castro was that of drug retailer and drug wholesaler, rather than the mere buyer-seller relationship Mason advocates. There was, therefore, sufficient evidence presented at Mason's first trial to support his conviction under 21 U.S.C. § 846.

*Pruitt's First Trial*

■ Pruitt also claims that the government failed to prove more than a mere buyer-seller relationship between him and

---

the following members of the conspiracy: Castro, his wife Anna, Duckworth, Duckworth's wife Jeanne, and Herman Franklin. The Castro and Duckworth children also accompanied the group from time to time.

7. After her arrest on July 11, 1984, Jeanne Duckworth was charged with two counts of delivering cocaine and heroin to Mason and Pruitt. In return for her cooperation in prosecuting the defendants, one charge was dropped and Jeanne pleaded guilty to the other, receiving a 3-year sentence.

8. Sally Young is Junior Ray Duckworth's niece. Unable to pay Mason, Young approached an MEG agent for money in return for information. She was given $250 to pay off Mason. Although the government presented no direct evidence that the "package" contained drugs purchased from Castro, a rational jury could

make such an inference based on the timing of the incident, the physical nature of the package's contents, and the amount of money Mason demanded for it.

9. Mason's number was listed in the name of Gerrie Smith, Mason's now ex-wife, with whom Mason lived on and off during the time covered by the charged conspiracy. Smith testified that although she answered the phone a couple of times when Castro called, she never spoke to him and he always asked for Mason. Castro's phone was listed in the name of Jose Sanchez, but Castro admitted the telephone number was his and that he had talked to Mason on the phone a number of times. The total number of phone calls between the two numbers from December 1983 to June 1984 was 55.

the other members of the Castro conspiracy. The evidence against Pruitt does not support his theory however. As with Mason, we review the evidence against Pruitt at his first trial in the light most favorable to the government. Viewed in this light the evidence at trial established that Pruitt made at least two, perhaps three, purchases from Castro and Duckworth before the conspiracy collapsed.[10]

These sales were made in June 1984 at Pruitt's mobile home in Danville, during two of the trips Castro and Duckworth made to Danville. On the first visit to Pruitt's trailer, Castro and Duckworth sold Pruitt one-half ounce of cocaine for $1000 or $1100. Pruitt paid in full for the cocaine upon delivery. Duckworth asked Pruitt if Pruitt "could get rid of it." Pruitt said "yes," so Duckworth "asked him would he want some more" and "gave him a phone number to KiKi's [Castro's] house." A second sale was made to Pruitt about a week later, again at Pruitt's trailer. This time Pruitt purchased one ounce of cocaine. Duckworth brought a set of scales into Pruitt's trailer during this sale because Pruitt claimed that the last purchase had been "short." Pruitt paid $1000 up front for the cocaine, arranging to pay the balance the following week when Castro and Duckworth were to bring Pruitt another half ounce. Although Castro and Duckworth brought this half ounce of cocaine to Danville the next week, they never delivered it to Pruitt; they were arrested before they could make the delivery to Pruitt.

Duckworth also testified that there had been a third completed sale to Pruitt. This sale would appear to have occurred between the two described above.[11] Duckworth stated that Pruitt bought an ounce

of cocaine from him for $2100, Pruitt paying for it in full upon delivery.

A rational jury could infer from the above evidence that Pruitt was more than a mere buyer for personal use. He purchased bulk packages of cocaine from Castro and Duckworth on at least two occasions, once on credit, with a declared ability to redistribute them. A rational jury could conclude that these were the actions of a low-level street dealer doing business with his supplier, and thus that Pruitt was in fact a member of the charged conspiracy.

Pruitt makes much of the brevity of his connection to the conspiracy, and the lack of evidence directly linking him to his codefendants Douglas and Mason. These facts are irrelevant. Parties to a conspiracy need not know all the other conspirators, nor participate in every aspect of the conspiracy in order to be a member of the conspiracy. *United States v. Davis*, 838 F.2d 909, 913 (7th Cir.1988); *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir.), *cert. denied*, 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985). Parties may yet be convicted "even though they join or terminate their relationships with core conspirators at different times." *Davis*, at 913.

Therefore, viewing the evidence against Pruitt in the light most favorable to the government, there is no question that a rational jury could conclude the Pruitt was in fact a member of the charged conspiracy, since his activities and statements essentially define the overall purpose and goal of the conspiracy. The evidence against Pruitt at his first trial was therefore sufficient to sustain his conviction under 21 U.S.C. § 846.

---

**10.** On the day the conspiracy collapsed, July 11, 1984, the Castros and the Duckworths were in Danville to make deliveries. They had a half ounce of cocaine with them which was earmarked for Pruitt according to the witnesses' testimony.

**11.** Castro testified that Pruitt purchased drugs from him twice; Junior Ray stated that it was three times. Jeanne, Junior Ray's wife, remembered only one sale. Although Pruitt makes much of these discrepancies, we do not find them significant. The witnesses' testimony was

not necessarily inconsistent. Junior Ray and Castro gave the same general account of two of the possibly three sales. Jeanne's description of the one sale she remembered corresponded to one of the two described by Junior Ray and Castro. How many sales actually occurred was a question of fact for the jury to resolve. Given the other evidence supporting Pruitt's conspiracy conviction, the jury could rationally have found Pruitt guilty whether they believed there was one, two or three sales.

Finally, we reiterate, because the government presented sufficient evidence against Mason and Pruitt at their first trial to sustain their convictions, the government was not barred from retrying them under *Burks* when they succeeded in overturning their convictions on the first appeal. Mason and Pruitt were therefore not subjected to double jeopardy upon retrial.

### Sufficiency of the Evidence at the Second Trial

At the close of the government's case at the second trial of these defendants, Douglas, Mason and Pruitt each moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that the government had failed to produce sufficient evidence upon which a jury could convict them. The judge denied these motions. The defendants chose not to put on any evidence in defense; the jury convicted each defendant of conspiracy to possess with intent to distribute and to distribute cocaine and heroin. Each defendant then filed a post-trial motion for acquittal on the same grounds and the judge denied these motions after hearing arguments. All three defendants now appeal the denial of these motions.

We note that while the standard of review on this precise issue—denial of a motion for acquittal on the grounds of insufficient evidence—is formulated somewhat differently than the test enunciated for a straightforward appellate challenge on the evidentiary sufficiency, the thrust of our review is the same.[12] We evaluate the evidence in the light most favorable to the government, and if *"any* rational trier of fact could have found the essential ele-

ments of the crime beyond a reasonable doubt," the judge committed no error in denying the motion for acquittal and we will affirm the conviction. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

■ We hold that under this standard of review, the government presented sufficient evidence at the defendants' second trial to survive a motion for acquittal and to support the jury's guilty verdict against each defendant.[13] We review the evidence offered against each defendant in turn.

### Mason's Second Trial

■ The evidence presented against Mason at his second trial differed somewhat in detail but not in substance from the evidence presented against him at the first. Viewed in the light most favorable to the government, the evidence revealed that Castro began travelling to Danville around March 1984 to sell drugs and collect money. Mason was one of the people with whom Castro dealt. Castro met Mason at Robert Franklin's Danville home in March 1984, when Castro was delivering two ounces of heroin to Franklin. Mason began visiting Castro's house in Chicago to buy drugs within two weeks of this meeting. On his first trip, Mason purchased one-half ounce of heroin, packaged in one bag, worth $800. Mason paid only $400 toward the cost of the heroin, promising Castro to return and pay off the rest as soon as he got the money together. Mason returned about a week and a half later and bought a half ounce of heroin (worth

---

12. For example, compare, *United States v. Marquardt*, 786 F.2d 771, 780 (7th Cir.1986), and *United States v. Beck*, 615 F.2d 441, 448 (7th Cir.1980), with *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988) and *United States v. Muskovsky*, 863 F.2d 1319 (7th Cir.1988). When reviewing a ruling on a motion for acquittal, the test that the court must use is whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the Government ... bear[ing] in mind that it is the exclusive func-

tion of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences.
*Marquardt*, 786 F.2d at 780.

13. In fact, the government's case against the three defendants was, if anything, stronger at the second trial. This does not run afoul of the Double Jeopardy Clause however. There is no per se rule that bars the government from polishing up its presentation on the second go round, or offering evidence not presented at the first trial, so long as retrial is permitted under *Burks* and its progeny.

$1000–$1200/ounce) and one-half ounce of cocaine (worth $2000/ounce). Although Mason paid $300–$400 toward the drugs he was taking with him, he asked Castro to carry him on the remainder and on the first purchase because he had had a truck accident. Two to three weeks later, Mason went to see Castro with Herman Franklin. Mason wanted an ounce of cocaine on credit and left his wife's car with Castro as security for the cocaine. Mason was back the next week with $2000 which he paid to Castro, and took another ounce of cocaine on credit. Although Mason offered to leave the car again as security Castro let him take it.[14]

Mason returned about one to one-and-a-half weeks later, paid $1400–$1600 on what he owed Castro, and took another half ounce of cocaine. Mason promised he would pay up as soon as possible, but when he returned two or three weeks later he had only $550. He put only $200 of this toward his account and asked for another half ounce of cocaine. According to Castro, on each visit, Mason was essentially paying for drugs he had purchased the previous visit and taking more with him. Castro also noted that he did not generally front drugs to users, that it would be unusual for a user to buy enough drugs at one time to last for several weeks and that an ounce of "cut" heroin would yield at least 100 dosage-size bags.[15]

Eventually, Mason stopped coming to see Castro, but since Mason still owed Castro money, Castro began looking for Mason on his trips to Danville. Mason had given

Castro his phone number and that of Cindy Klaman, Mason's girlfriend; Castro wrote them down on a piece of paper, which he kept in his wallet.[16] Castro attempted to call Mason at both these numbers.

Castro went to Danville a total of seven or eight times in June and July 1984. On the first trip, Castro located Mason through Klaman. Mason paid Castro $300–$350 on what he owed and asked to take another half ounce of cocaine. Castro refused to sell Mason the drugs because Mason had only $300, but later that afternoon, Klaman caught up to Castro on his way out of town and persuaded him to sell her about $600 worth of cocaine for the $300.[17]

Both Duckworths again testified that they knew Mason and had seen him at Castro's house. Herman Franklin also testified once again that he had introduced Mason to Castro at his nephew's house in Danville. The government again introduced the telephone records, limiting them, however, to the time period of March 1984 to June 1984. Sally Young also repeated her testimony regarding Mason's demand for payment for the "package" she had lost, and his earlier offer to pay her for holding "packages."[18]

In sum, the evidence presented at Mason's second trial, like the evidence presented at his first trial, reveals more than a casual buyer-seller relationship between Mason and Castro. Rather, the evidence reveals an ongoing business relationship, wherein Mason bought drugs in bulk, on a

---

**14.** This car was owned by Gerrie Smith, Mason's wife. She testified that Mason borrowed her car and told her it broke down in Chicago. She gave him about $500 to have it repaired. He returned the car to her the next day.

**15.** There was some confusion as to how many doses could be had from an ounce of heroin. The low estimate was 100, the highest, 1200. A lack of clarity regarding the difference between pure and "cut" heroin apparently explains this discrepancy. In any event, Castro clearly testified that one ounce of "cut" heroin would yield at least 100 doses, an estimate that undermines the defendants' claim that the half-ounce and one-ounce quantities of drugs they were purchasing every week or so were strictly personal-use quantities.

**16.** This piece of paper was introduced into evidence at the second trial.

**17.** This incident was corroborated by Herman Franklin who was with Castro on this particular trip to Danville.

**18.** Young recounted three different versions of what happened to the missing package before the grand jury and at the two trials.

Mason makes much of this inconsistency in her testimony, but we do not find it relevant, nor does it in any way undermine the jury's verdict. The critical factor in Young's testimony remained constant—Mason's claim of ownership.

"front," then returned a short time later with substantial amounts of cash to pay on what he owed and pick up more drugs. A rational jury could conclude from such a relationship that Mason was a dealer and Castro his supplier, especially in light of Castro's testimony that he did not generally front drugs to users, that it would be unusual for a user to buy enough drugs at one time to last for several weeks and that an ounce of "cut" heroin would yield at least 100 dosage-size bags. Contrary to the defendants' assertions to this court, there was far more than mere quantity evidence presented at the second trial from which a jury could properly infer that Mason was a member of the conspiracy charged. There was sufficient evidence presented at the second trial to convict Mason and the trial court properly denied Mason's motion for acquittal.

*Pruitt's Second Trial*

■ As with Mason, the evidence offered against Pruitt at his second trial was very similar to the evidence offered at the first trial, except for one piece of evidence which the defense argues is crucial. At the second trial, Junior Ray Duckworth mentioned, for the first time, a telephone call that occurred between him and Pruitt. According to Duckworth, he called Pruitt in late June 1984 and asked Pruitt if he could get rid of some drugs; Pruitt said "yes," if the drugs were "good." It was after this telephone call that Castro and Duckworth delivered drugs to Pruitt on two occasions at his mobile home.[19]

Pruitt argues that the telephone conversation testimony is critical to Pruitt's reconviction because, if believed by the jury, it establishes a link between Pruitt and the conspiracy that was not proved at the first

trial. Pruitt is correct; this conversation is a key link between Pruitt and the conspiracy for it indicates that Pruitt was not a mere personal-use drug buyer. We disagree, however, that this evidence appeared for the first time at Pruitt's second trial. Duckworth testified at the first trial to essentially the same conversation, the only difference being that at the first trial he stated that the conversation took place at Pruitt's trailer on the first visit. The substance of the conversation was the same however.[20]

The rest of the evidence presented against Pruitt at the second trial was almost identical to the evidence presented at the first trial. There was therefore sufficient evidence, when viewed in the light most favorable to the government, from which a rational jury could find Pruitt guilty beyond a reasonable doubt of the conspiracy charged. The judge committed no error in denying Pruitt's motion for acquittal.

*Douglas's Second Trial*

■ Douglas challenges the sufficiency of evidence presented at his second trial on the same basic premise as Mason and Pruitt—that the government proved nothing more than a mere buyer-seller relationship between Douglas and any other member of the conspiracy. Douglas contends that all that was proven was that he bought relatively small quantities of drugs from Castro on two occasions, and that Douglas sold drugs to others at times not related to the purchases from Castro. Only a very strained reading of the evidence, however, could support such a view.

Viewing the evidence, as we must, in the light most favorable to the government,

---

**19.** Pruitt also objects to the fact that Castro and both Duckworths consistently testified at the second trial that two trips were made to Pruitt's trailer, whereas each witness gave a different number at the first trial. Again, these variations are not critical for the reasons set out in note 11, *supra.*

**20.** Again the defendants all seem to argue that double jeopardy is triggered simply because the evidence presented on retrial was slightly different and presented with more polish. The test

for double jeopardy in the context of a retrial, however, is not whether the evidence at the *second* trial was more persuasive than that presented at the first trial. Rather the question is whether the evidence at the *first* trial was sufficient to support the first conviction. If the answer to this latter question is yes, then the government is entitled to try the defendant again, and there is no per se rule barring the government from strengthening its case upon retrial.

the evidence presented against Douglas revealed that Castro first met Douglas in the first half of 1984, when James Anderson, another member of the conspiracy, brought Douglas to Castro's Chicago home. At this first meeting, Douglas and Anderson bought a half ounce of cocaine, worth $1000, from Castro. They paid Castro only $300, each guaranteeing the other for payment of the balance on their next visit. When the pair returned a week or so later they were unable to pay off all of this outstanding debt, but Castro let them take three-eighths ounce each of heroin and cocaine on credit. This was the last time Castro saw Douglas in Chicago; he searched for Douglas on the trips to Danville with Duckworth, but never located him.

Douglas thus had the same sort of fronting arrangement with Castro that Mason and Pruitt had, the sort of arrangement that Castro stated was not used with mere drug users. Further, although Castro stated that he had no idea what Douglas intended to do with the drugs he purchased, the government impeached this statement by presenting testimony from Douglas's first trial in which Castro stated that Douglas was going to sell the drugs he and Anderson bought from Castro.

In addition, three other witnesses provided testimony from which the jury could infer that Douglas did in fact distribute, or at least intended to distribute, the drugs he purchased from Castro. Clarence Severado[21] regularly purchased drugs from Douglas in early 1984, buying quarter-gram bags of cocaine once or twice a week, for $25 a bag. In late May or early June 1984, Severado drove Anderson and Douglas to Chicago to buy drugs. Douglas provided small amounts of drugs on this trip, which Douglas and Anderson used on the way to Chicago while Severado drove. According to Severado, Douglas and Anderson picked up about one-quarter ounce each of heroin and cocaine in Chicago. They told Severado they paid for one and took the other on "consignment." On the trip back to Danville, Severado was allowed to use some of these drugs as payment for providing the van and the gasoline used on the trip. The three men did not use up all the drugs purchased on the trip back; Douglas and Anderson cut everyone off at some point. Severado stated that he noticed the drugs purchased in Chicago were of better quality than the drugs Douglas generally sold to Severado, and that he knew Douglas would "cut" these drugs once the men returned to Danville.

Severado did not purchase drugs from Douglas after this trip, but another witness, Sally Young, testified that she purchased some cocaine in $25 and $50 quantities from Douglas at his home in May or June 1984. Mary McCloud,[22] Douglas's neighbor, testified that in May and June 1984, both she and Douglas were selling cocaine. Douglas gave her about $200 worth of cocaine and told her how much to charge for it. Douglas sent buyers to her house where she sold the cocaine in $25 bags. She gave the money collected to Douglas. McCloud knew that Douglas's drugs came from someone in Chicago, but she did not know Castro, nor did she ever talk to him on the telephone. Telephone records indicated, however, that there were five calls placed to Castro's telephone number in May 1984 from McCloud's phone.[23] McCloud explained this by stating that Douglas made long distance calls from her telephone and later paid her for them.

Based on this evidence, a jury could easily find that Douglas was a member of the charged conspiracy. He was dealing drugs before he began purchasing drugs from

21. Severado was never prosecuted for the activities described here, nor did he testify at Douglas's first trial, apparently because the government could not locate him at the time.

22. McCloud testified under a grant of immunity.

23. McCloud's telephone number was listed in the name of Tina Brandon, McCloud's young daughter. Shirley Tools, McCloud's housemate, testified that she too did not know Castro. Telephone records indicated no calls between McCloud's phone and Castro's phone in March, April or June 1984.

Castro.[24] He purchased drugs on credit from Castro on two occasions. He distributed drugs to Severado as a quid pro quo for providing transportation to Chicago to buy drugs. The timing and details of this trip correspond to Castro's version of the second purchase made by Anderson and Douglas. The jury could therefore properly infer that the same purchase was being described by both Castro and Severado. Further, after this trip, Douglas continued to distribute drugs to Young and McCloud, and through McCloud to unnamed others. There is no question that a rational jury could conclude from such evidence that Douglas conspired with other members of the charged conspiracy to distribute or at least possess with intent to distribute cocaine and heroin. The trial court properly denied Douglas's motion for acquittal.

### Prosecution's Use of Perjured Testimony

The defendants also moved for a new trial after they were convicted at their second trial on the theory that the government had presented perjured testimony against them. The trial court denied these motions. Only Mason and Pruitt appeal this denial.

Mason and Pruitt allege that the discrepancies between the witnesses' testimony at the second trial and their testimony at the first trial and before the grand jury were so great as to constitute perjury. Mason alleges that the testimony of Castro, Junior Ray Duckworth, and Sally Young was perjurious; Pruitt complains mostly about Junior Ray Duckworth's testimony.[25] The trial court heard full argument on this issue at a post-trial hearing before denying the motions.

We review the denial of a motion for a new trial based on the prosecution's alleged use of perjured testimony under an abuse of discretion standard. *United States v. Kaufmann*, 803 F.2d 289, 291 (7th Cir. 1986). We will not disturb the trial court's ruling on the motion "unless there has been an error as a matter of law or a clear and manifest abuse of judicial discretion." *Kaufmann*, 803 F.2d at 291 (quoting *United States v. Nero*, 733 F.2d 1197, 1202 (7th Cir.1984)).

A new trial should be ordered, on the basis of the prosecution's use of perjured testimony, if the defendant establishes that 1) the prosecution's case included perjured testimony; 2) the prosecution knew, or should have known, of the perjury; and 3) there is any likelihood that the false testimony could have affected the judgment of the jury. *Kaufmann*, 803 F.2d at 291. *See Napue v. Illinois*, 360

---

**24.** Douglas contends that evidence that he was dealing drugs before and after the time he bought drugs from Castro does not prove he distributed *the* drugs Castro sold him. However, Douglas was charged with conspiracy to possess with intent to distribute and to distribute drugs, not with actual distribution. Evidence of drug distribution before and after the purchases from Castro is probative of Douglas's *intent* with regard to the drugs he bought from Castro—did he possess the drugs with intent to distribute them? Furthermore, a jury could infer that the distribution incidents recounted by the witnesses did involve drugs sold to Douglas by Castro, since there was an overlap in time.

**25.** In particular the defendants point out these discrepancies:

*Castro:* Testified at the second trial that he met Mason in 1984 at Robert Franklin's house and that Mason bought drugs from him in Chicago two weeks later. Testified previously that he met Mason in September 1983 at Franklin's house and began selling drugs to Mason then.

*Junior Ray Duckworth:* Testified at the second trial that he met Castro in early 1984 and began to work for him, that he never delivered drugs to Mason, and that Pruitt told him on the telephone that he could get rid of the drugs. Previously testified before the grand jury that he began buying drugs from Castro in the summer of 1983 and would sell them in Danville, and that he delivered four ounces of heroin to Mason through Herman Franklin. At first trial he stated that Pruitt said he could get rid of the drugs on the first trip to the trailer.

*Sally Young:* At the second trial stated she put Mason's package in a car, did not know what happened to the package. Previously testified at grand jury hearing that she had put the package in her house where it was stolen when her house was burglarized. At defendants' first trial said she had put the package in her car and did not know what happened to it.

U.S. 264, 269–71, 79 S.Ct. 1173, 1177–78, 3 L.Ed.2d 1217 (1959).

■ The trial court rejected the defendants' motion for a new trial, finding that the objectionable testimony was not in fact perjured, but merely inconsistent. The prosecution fully admitted that there were variances between the witnesses' testimony at the second trial and their earlier testimony, but argued that there was nothing sinister in these discrepancies, nor had the government ever hidden them from the defendants. According to the prosecution, the variations were the result of memory defects or narrowed questioning. Further, the prosecution argued that some of the complained of discrepancies went to immaterial and collateral issues,[26] or else actually benefitted the defendants at their second trial.[27] Additionally, the government noted that the defendants had the opportunity to fully cross-examine the witnesses and exploit these inconsistencies at trial.

The trial judge, persuaded by these facts, found that no perjured testimony had been offered by the government against the defendants. Having made this finding the trial judge concluded that the defendants were not entitled to a new trial. We see no error in the trial court's findings regarding the nature of the allegedly perjured testimony. The trial court therefore did not abuse its discretion in denying the defendants' motions for new trial.

### *Prosecution's Failure to Disclose Promise of Leniency*

■ Mason and Pruitt both challenge the trial court's denial of their motions for new trial based on the prosecution's failure to reveal an alleged promise of leniency to Herman Franklin. As noted earlier, Franklin was an unindicted coconspirator and a key government witness at the defendants'

trial. Franklin was never indicted, charged or convicted for his participation in the Castro drug conspiracy. According to the prosecution, the government never promised Franklin immunity or offered any other consideration for his cooperation and testimony. Yet Franklin gave numerous statements to the police during the investigation of this conspiracy, appeared before the grand jury, and testified at both trials involving these defendants—in every case admitting pervasive involvement in the conspiracy.

At trial, the defendants cross-examined Franklin extensively on the issue of whether the government had offered any promises of leniency for his nephew Robert Franklin and himself if Franklin would testify.[28] Franklin steadfastly denied that any such promises were ever made, stating that he was voluntarily cooperating with the government and hoping for the best.

After these defendants were convicted, however, Mason reported to his attorney that Franklin had changed his story. Mason's attorney called Franklin at his home and questioned him. Franklin stated that the Danville MEG agents promised him at his first interview in September 1984 that neither he nor his nephew would be prosecuted if he cooperated and testified against the other members of the conspiracy. Franklin later made similar assertions to Anderson's attorney. In response to this revelation, the defendants moved for a new trial on the basis of newly discovered evidence, supporting their motions with the affidavit of Mason's attorney.

The trial court, understandably concerned about this new development, held evidentiary hearings on these motions, taking the testimony of Herman Franklin and the agent who had originally interviewed Franklin on September 24, 1984. Both the

---

**26.** For example, what really happened to the package Young was holding for Mason was irrelevant and collateral to the critical point—Mason's claim of ownership.

**27.** For example, narrowing the questioning of Junior Ray Duckworth to what happened only in the spring and summer of 1984 meant that he did not tell the jury about the four ounces of heroin he delivered to Mason in 1983. Mason

can hardly claim that the failure to present such testimony prejudiced him at his second trial.

**28.** There is evidence in the record that Robert Franklin purchased fairly large quantities of drugs from Castro and Duckworth, or that he had at least accepted delivery of drugs from them. *See* note 6, *supra.*

agent and Franklin denied that Franklin was ever offered any promises of leniency for his cooperation. The Assistant United States Attorney who prosecuted both trials against these defendants stated that neither she nor anyone in her office had ever offered Franklin any sort of consideration for his cooperation and testimony.

Upon considering all the evidence and the arguments, the court found that no promises were made to Franklin. The judge stated that while he believed that Franklin had in fact told the defendants' attorneys that he had been offered leniency in return for his testimony, the judge also thought that Franklin was "street-wise" and a "survivor," and likely to tell others what he thought they wanted to hear. Faced with the dilemma of choosing between two exactly opposite versions of the facts, the court found that despite his recent assertions to the contrary, the government had not made any offers of leniency to Franklin. The court found that Franklin's one out-of-court statement that he had been offered a promise of leniency could not overcome his repeated sworn statements to the contrary. The court also noted that Franklin had been subjected to repeated and extensive cross-examination on this issue at two trials and now at a post-trial hearing; on each occasion he adamantly denied any offers of leniency. The court therefore denied the defendants' motions for new trial based on newly discovered evidence.

Rulings on new trial motions based on newly discovered evidence are reviewed under an abuse of discretion standard. *United States v. Streich*, 759 F.2d 579, 587 (7th Cir.), *cert. denied*, 474 U.S. 860, 106 S.Ct. 172, 88 L.Ed.2d 142 (1985); *United States v. Kaufmann*, 803 F.2d 289, 291 (7th Cir. 1986). *See also United States v. Kelly*, 790 F.2d 130, 133 (D.C.Cir.1986). We will reverse only if the district court misapplied the law or abused its discretion. *Kaufmann*, 803 F.2d at 291; *Kelly*, 790 F.2d at 133.

Although *United States v. Goodwin*, 770 F.2d 631 (7th Cir.1985), cited by the government in its brief, provides the general test applied to motions for new trial based on newly discovered evidence, where the newly discovered evidence consists of undisclosed promises of leniency to witnesses by the government, the standards to be applied are those found in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). *United States v. Kehm*, 799 F.2d 354 (7th Cir.1986). *See also Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Bagley* requires that a new trial be ordered if the evidence withheld by the government from the defendant is exculpatory and material.[29]

A logical prerequisite to applying the *Bagley* test, however, is a finding that the government actually withheld something from the defendants. In the instant case, the trial court found that nothing had been withheld from the defendants when it concluded that no promises were made to Franklin in return for his cooperation and testimony against the defendants. The trial court reached this conclusion after an extensive evidentiary hearing and we cannot say that such a factual finding is clearly erroneous, particularly where as here the issue of witness credibility is so crucial to resolving a direct factual conflict. Since there was no newly discovered evidence that had been withheld by the government, the court did not need to engage in a *Bagley* analysis and it was not an abuse of discretion to deny the defendants' motions for new trial.

*Prosecution's Failure to Disclose Douglas's Role as a Government Informant*

▇▇▇ In May 1988, eight months after the defendants' second trial and while each had an appeal pending before this court, the government released to the defendants previously undisclosed evidence about defendant Douglas.[30] This evidence consist-

---

**29.** *See infra* at 1163–64 for discussion of these terms.

**30.** While the government argued to the district court that it had no obligation to turn over the

ed of MEG investigative reports on Douglas and transcriptions of telephone calls made by Douglas to Castro and Mason. It appears that from June 12, 1984 until June 18, 1984, Douglas cooperated with the authorities investigating the Castro drug conspiracy. During his short tenure as a government informant, Douglas provided the authorities with the names and addresses of people from whom he bought and to whom he sold drugs (mentioning, among others, Mason but not Pruitt), and arranged an attempted drug buy between MEG agents and Castro. The recorded telephone calls related to the setting up of this transaction. As it turned out, the purchase fell through when, despite assurances to the contrary, Castro failed to be at home on the day Douglas and Agent William Haley of the Danville MEG traveled to Chicago to consummate the sale. Three days later, when Agent Dennis Haley visited Douglas at home, Douglas became angry and abusive to the agent and severed his ties with the MEG.

All three defendants moved for a new trial when this evidence came to light. The trial judge held a hearing on Mason's and Pruitt's motions on June 3, 1988. After hearing arguments from the government and the defendants, the judge denied the motions from the bench. Douglas's motion for a new trial based on this newly disclosed evidence was heard on July 22, 1988; it too was denied from the bench. Neither Mason nor Pruitt filed a notice of appeal from the denial of their motions. Douglas did file a notice of appeal after receiving an extension of time from the district court.

▮ While all three defendants argue in their briefs that the trial judge erred in

denying their new trial motions, only Douglas has properly perfected an appeal on this issue. Mason and Pruitt failed to file a notice of appeal within 10 days of the trial court's denial of their motions for new trial. In fact, no notice of appeal was ever filed by either Mason or Pruitt. It is well settled that a district court may entertain a timely filed motion for new trial while an appeal from the related conviction is pending in this court. *United States v. Ellison,* 557 F.2d 128, 132 (7th Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450 (1977). While the moving party must petition for a remand from this court if the district court indicates that it is inclined to grant the motion, *id.* at 132, the district court may deny the motion without leave of this court, *United States v. Cronic,* 466 U.S. 648, 667 n. 42, 104 S.Ct. 2039, 2051 n. 42, 80 L.Ed.2d 657 (1984) (citing *Ellison* ). If the motion is denied, "the defendant may then take a separate appeal from the district court's ruling and move to have it consolidated with the direct appeal previously taken from his conviction." *Ellison,* 557 F.2d at 132.

Mason and Pruitt failed to follow this procedure after the district court denied their motions for new trial. Because timely filing of a required notice of appeal is a jurisdictional predicate to appellate review, *United States v. Estevez,* 852 F.2d 239, 241 (7th Cir.1988), we lack the power to review the district court's denial of Mason's and Pruitt's motions for new trial based on the newly disclosed evidence of Douglas's role as an informant.

▮ Douglas, on the other hand, did properly perfect an appeal on this issue,

---

reports to the defendants, it appeared to concede the point on appeal. In any event, it seems that the failure to provide the information was not intentional or in bad faith—the government claimed to have misplaced the reports very early in the Castro conspiracy trials and had forgotten they even existed until they surfaced some months after the defendants' second trial. The reports were promptly turned over to the defendants when they were discovered.

This seems a plausible explanation since the reports contain highly inculpatory information about Douglas and Mason yet nothing in the

reports was ever introduced at either the first or second trial of these defendants. We note, however, that the good or bad faith of the government is largely irrelevant in determining whether a new trial should be ordered. "If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976). *See also United States v. Brimberry,* 803 F.2d 908, 913 (7th Cir.1986).

albeit narrowly so.[31] We therefore address the merits of his contention that the district court erred in denying his motion for a new trial based on the newly discovered evidence of his brief career as a police informant.[32]

Under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), the government is obligated to turn over evidence in its possession that is both favorable to the accused and material to the issue of guilt or punishment. *See also United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). "Favorable" evidence includes exculpatory substantive evidence, as seen in *Brady* and *Agurs*, as well as evidence with impeachment value, *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Evidence is "material" if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383 (Blackmun, J.), *quoted with approval in Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987). Failure to disclose evidence that meets the *Brady–Bagley* test constitutes a violation of due process, entitling the defendant to a new trial. *United*

*States ex rel Smith v. Fairman*, 769 F.2d 386, 391–93 (7th Cir.1985).

In the instant case, the transcript of the hearing indicates that the trial judge essentially collapsed the two-prong test of *Brady–Bagley* into one inquiry when he denied Douglas's motion for a new trial.

I do not believe that this new information is material under the definition of the *Bagley* case; that is, only if it creates a reasonable probability that had the information been conveyed that the result would have been different.

I frankly don't see anything in here that would meet that test on the basis of analysis of whether or not the information undermines confidence in the outcome that the jury arrived at. It clearly doesn't do that.... I would simply say that I think it is best to characterize this as inculpatory and not exculpatory.... [F]or the most part [the new evidence] describes [Douglas's] position in this matter. And I don't think it is fair to say that he is simply described as a user. So for those reasons the motion for a new trial is denied.[33]

■ Ideally a court asked to rule on the impact of newly disclosed evidence will clearly articulate findings under both prongs of the *Brady–Bagley* test. A trial judge should rule first on the question of whether the evidence is favorable—is it

---

**31.** Douglas should have filed his notice of appeal on or before August 1, 1988. Fed.R.App.P. 4 (appellant must file notice of appeal within 10 days of entry of judgment or order appealed). Douglas's counsel, incorrectly believing the original notice of appeal sufficient to cover the denial of the new trial motion, failed to file a new notice of appeal. Luckily he discovered his mistake when this court's clerk refused to permit the filing of a brief on the issue of the district court's denial of the new trial motion. On August 29, 1988, Douglas's counsel petitioned the district court for an extension of time to file a notice of appeal (this was a timely motion). The court granted the extension on the grounds of excusable neglect. Douglas's notice of appeal was filed the same day, within the 40 day outside limit of Rule 4(b). The grant or denial of a timely motion for an extension of time within which to file a notice of appeal is within the sound discretion of the district court. *See United States v. Kaden*, 819 F.2d 813, 815–17 (7th Cir.1987). And while we find no abuse of

discretion in this case because of the unique procedural circumstances, we emphasize that failure to understand and comply with the rules governing appeals to this court will virtually never qualify as "excusable neglect" under Rule 4(b).

**32.** As the government points out, Douglas's characterization of the evidence detailing his role as an informant as "newly discovered" is somewhat disingenuous. An individual is expected to remember his own actions, and while Mason and Pruitt may have had no reason to know of Douglas's dual life, Douglas himself can hardly pretend ignorance. The evidence involved, however, consists of more than the mere fact of his role as an informant. The reports and transcripts give specific details of that relationship. We can imagine a case where such information might be significant to preparation and presentation of a defense.

**33.** Government's Supplemental Appendix 21–22.

exculpatory or valuable for impeachment purposes. If the answer to this threshold question is no, then the evidence is not *Brady* material and there is no prosecutorial duty to disclose in the first instance. If the evidence *is* favorable, only then must the judge rule on the question of materiality. *See, e.g., United States v. Kehm,* 799 F.2d 354 (7th Cir.1986); *United States v. Jackson,* 780 F.2d 1305 (7th Cir.1986).

Although the trial judge did not clearly follow the above format, he properly denied Douglas's motion for a new trial. The government, in oral argument, indicated that it had argued to the trial court that the newly discovered evidence was not in fact favorable to Douglas. Although the government did not press this point in its brief, the argument has no small merit. As noted above, to be "favorable" under the *Brady–Bagley* test, newly disclosed evidence must be exculpatory, not inculpatory. And at first blush the newly disclosed evidence rather strongly implicates both Douglas and Mason in the charged conspiracy. In the interviews he had with the MEG agents while working as an informant, Douglas freely admitted buying drugs from Castro and others (including Mason), admitted selling drugs, and told Mason in the recorded telephone conversations that he intended to make another drug purchase from Castro. This is hardly the cloth from which to cut a viable defense.

Douglas does make a legitimate point, however, that this evidence could have been used to rebut or impeach the testimony of other witnesses at trial. At trial, Junior Ray Duckworth testified that he had seen Douglas sitting in a car with another man outside Castro's house in June 1984. From this and other evidence the jury could and did conclude that Douglas was a member of the charged conspiracy. The newly disclosed police reports indicate, however, that what Duckworth saw might actually have been Douglas, acting as an informant, attempting to make a drug buy from Castro with Agent William Haley. The defense could have used the reports to counter Duckworth's testimony. We therefore give Douglas the benefit of the doubt, and assume (although it is a close question) that at least some of the newly disclosed evidence is favorable to him.

Even if this evidence may be characterized as favorable *Brady*-type material, Douglas still cannot clear the second hurdle of the *Brady–Bagley* test—materiality. We agree with the trial court that there is no reasonable probability that the outcome of Douglas's trial would have been different had Douglas possessed this evidence prior to trial. Even if the defense had introduced the reports to rebut Duckworth's testimony, there was sufficient other evidence offered at trial to sustain Douglas's conviction. Furthermore, once portions of the reports were introduced into evidence by the defense, the government likely would seek to introduce the remainder of the reports, and most of the material contained in the reports and transcriptions is highly inculpatory.[34] Our confidence in the outcome of the trial is not undermined by the disclosure of this new evidence; the evidence is therefore not material within the meaning of *Bagley*. The trial court properly denied Douglas's motion for new trial.

## III. CONCLUSION

For the foregoing reasons, we affirm the defendants' convictions.

AFFIRMED.

---

**34.** We express no opinion about whether such material would in fact be admissible against

Douglas or a similarly situated defendant.