UNITED STATES of America,
Plaintiff–Appellee,

v.

Marc L. POLLAND, Defendant–
Appellant.

No. 92–1702.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 3, 1992.

Decided May 28, 1993.

Rehearing and Rehearing In Banc Denied
July 29, 1993.

---

Rodney Cubbie (argued) Office of U.S. Atty., Milwaukee, WI, for plaintiff-appellee.

Ann Auberry, Milwaukee, WI, Thomas G. Halloran, Fox & Fox, Madison, WI, Michael R. Barth, Burlington, WI, for defendant-appellant.

Before FLAUM and ROVNER, Circuit Judges, and LAY, Senior Circuit Judge.[*]

FLAUM, Circuit Judge.

Khalil Muhammad was arrested at his apartment at 3885 North Sherman Boulevard in Milwaukee, Wisconsin on June 22, 1989. Marc Polland, an attorney and a personal friend of Muhammad's, heard of his arrest and went to see him at the U.S. Marshall's Office at the federal courthouse. During that meeting, Muhammad told Polland that approximately two kilograms of cocaine were concealed in a milk chute in the downstairs hallway of the apartment building. Muhammad asked Polland to retrieve the cocaine and turn it over to Michael Johnson, who had started selling cocaine for Muhammad in the spring of 1988. Polland responded that Johnson was not someone who could be trusted, and before the two parted, Polland indicated that he would not turn any of the cocaine over to Johnson.

That same day, Muhammad's landlord Richard Hackbarth received a phone call from an acquaintance who wanted to come by and get into the milk chute. After this phone call, Hackbarth, who had been introduced to Polland several months prior to Muhammad's arrest and had noticed Polland visiting Muhammad on a number of occasions afterward, called Polland and reported that he had "a real problem." Polland went to the building after visiting Muhammad at the federal courthouse and planned with Hackbarth for the removal of the cocaine from the milk chute. According to Hackbarth, there were three plastic bags of cocaine inside. Polland arranged to have James "Sonny" Harrison retrieve the cocaine that evening.

Polland later told Muhammad that he had possession of the two kilograms of cocaine. Apparently believing that he would be released, Muhammad decided to allow Polland to keep the cocaine. In fact, Harrison kept actual possession of the cocaine at first. Periodically, Harrison received instructions from Polland to deliver a "document"—a half-ounce or an ounce of cocaine. Harrison himself also sold approximately eight ounces of the cocaine for his own personal gain. Eventually, Polland demanded and received the remaining cocaine, which amounted to a little over a kilogram. Polland contends that he consumed a "tennis ball" size portion of cocaine and destroyed the remainder.

In November, 1989, Muhammad was convicted. After his conviction, Muhammad instructed Johnson to get the cocaine from Polland and sell it to raise money. Between November of 1989 and January of 1990, Polland dealt a total of six ounces of cocaine to Johnson in five deliveries. Eventually, Polland and Johnson had a falling out over the price of the cocaine. Polland also told Johnson not to tell Muhammad anything about their drug transactions because Muhammad talked too much.

Muhammad did talk, and among those he fingered was Polland. Prior to this, Muhammad, while away from Polland, had handed the Assistant United States Attorney a folded piece of paper after a final pretrial conference for Muhammad and had requested that it be passed along to the Deputy United States Attorney. The paper contained a diagram of a "hypothetical operation." Determining that the paper was not in and of itself significant, the government did not disclose it to Polland. After Muhammad's conviction, the government obtained a grant of immunity for him and had him testify before the grand jury. In his testimony, Muhammad implicated Polland in cocaine distribution. After a jury trial, Polland was convicted of

[*] The Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, sitting by designation.

conspiracy to possess with intent to distribute cocaine and possession with intent to distribute. With enhancements for obstruction of justice and abuse of trust, Polland's sentence totaled 121 months. He appeals.

## I.

### A.

■ Polland has raised a number of issues on appeal, only some of which merit discussion. He alleges first that the government engaged in widespread misconduct throughout the investigation and trial of this case. In particular, Polland challenges the prosecutor's acceptance of the diagram of the hypothetical operation from Muhammad without any disclosure to Polland, who was acting as Muhammad's attorney. According to Polland, the government's conduct violated Federal Rules of Criminal Procedure 16(a)(1)(A) as well as the duty to notify the court and Polland himself of the conflict. The principal flaw in this argument is that any right violated belongs to Muhammad, not Polland. He has no standing to assert Muhammad's rights. In addition, Polland cannot identify any prejudice to him on account of the nondisclosure. Certainly, the government is under no obligation to inform suspects that they may be under investigation.

### B.

■ Polland also argues that the trial court erred by denying his motion for an evidentiary hearing to determine whether the indictment should have been dismissed for prosecutorial misconduct or vindictive prosecution. A prosecution is vindictive and a violation of due process if undertaken "[t]o punish a person because ·he has done what the law plainly allows him to do." *United States v. Goodwin*, 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982). The filing of an indictment may in some instances be the basis for such a claim. *See United States v. Napue*, 834 F.2d 1311, 1329 (7th Cir.1987). Whether to hold an evidentiary hearing is a matter within the court's discretion. *United States v. Valona*, 834 F.2d 1334, 1340 (7th Cir.1987). A trial court is not required to conduct an evidentiary hearing

on a claim of prosecutorial misconduct unless a substantial right of the defendant has been put in jeopardy. *See United States v. Wilson*, 715 F.2d 1164, 1169 (7th Cir.), *cert. denied*, 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983). The court should grant an evidentiary hearing on the issue of vindictive prosecution only when a defendant has offered sufficient evidence to raise a reasonable doubt about the propriety of the government's conduct. *See United States v. Heidecke*, 900 F.2d 1155, 1160 (7th Cir.1990).

■ Polland contends that an evidentiary hearing was warranted for a couple of reasons. First, Polland thinks that his prosecution stems in part from a letter he submitted to the United States Attorney for the Eastern District of Wisconsin complaining about the conduct of the Drug Enforcement Administration. Second, he believes that a hearing would clear up whether Muhammad had been put up to implicating Polland in the cocaine distribution scheme. Polland offered no other facts to the trial court to support his motion for a hearing.

Neither of these reasons offered by Polland amounts to a showing of actual vindictiveness. In his capacity as an attorney, Polland complained of alleged D.E.A. improprieties against his clients. However, he has not shown a nexus between these incidents and his own subsequent indictment. In addition, Polland has not established any factual basis for his allegation of government intervention or misconduct in the production of the hypothetical operation diagram. The district court's decision not to hold an evidentiary hearing was not in error.

### C.

■ A third claim advanced by Polland is that the government's failure to disclose exculpatory evidence. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Withholding evidence constitutes a *Brady* violation only if it is both favorable to the accused and material. *United States v. Douglas*, 874 F.2d 1145, 1163–64 (7th Cir.), · *cert. denied*, 493 U.S. 841, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989). Evidence is material "only if there is a reasonable probability that,

had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Dweck,* 913 F.2d 365, 371 (7th Cir.1990) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)).

■■■ During pretrial, Polland had requested the disclosure of evidence of his non-involvement in drug distribution. It was only in the course of the cross-examination of F.B.I. Agent Plambeck that the defense learned that the D.E.A. may have attempted to make a controlled buy from Polland several years earlier. This evidence is not favorable to Polland. If anything, it reflects the fact that the D.E.A. harbored suspicions about Polland's conduct, which is more inculpatory than exculpatory. The evidence is also not material. No reasonable probability exists that this evidence would have been sufficient to rebut the direct evidence of Polland's conduct in the present case.

■■■ Polland similarly argues that the government failed to disclose a preindictment interview with one of its witnesses. At the outset of a conversation with Agent Plambeck, Michael Johnson, a witness, appeared to be withholding information. The prosecutor and Plambeck allowed him to talk with Muhammad by phone. After the unmonitored phone call, Johnson was more cooperative. Polland contends that this episode constituted *Brady* material, and the government's failure to disclose it represented bad faith, if not animus. However, it is not clear that this information was favorable to Polland. *See Douglas,* 874 F.2d at 1163. Although the defense may have relied on it to impeach Johnson, it had ample opportunity to explore the relationship between Muhammad and Johnson, including their phone conversations, and impeach Johnson during his cross-examination. (Tr. 279–83, 301–02). Moreover, Agent Plambeck did not say or suggest that Johnson was lying or being untruthful; rather, Plambeck thought that Johnson was withholding information. And even if this evidence could be construed as favorable, it is not material. The defense's cross was directed primarily at discrediting Johnson for bias. There is no reasonable probability that this additional shred would have altered the outcome of the trial. It follows that the absence of any *Brady* violation answers the question of government bad faith or animus in not disclosing the phone call.

### D.

■■■ Polland also alleges that the prosecutor made numerous prejudicial errors during closing and rebuttal argument. Among the errors cited by Polland, the prosecutor told the jury to do its job by returning a guilty verdict, improperly shifted the burden of proof by arguing that Polland could have called Muhammad as a witness, overreacted to the defense's characterization of Muhammad and Johnson as "boys," and alluded to his special insight into the crime world. In fact, it appears that Polland has engaged in a fishing expedition through the trial transcript, casting about for any remotely colorable violations by the government. Because Polland failed to object to any of these remarks during closing argument, we review them under the plain error standard. *United States v. Martinez,* 937 F.2d 299, 308 (7th Cir.1991).

■■■ First, Polland has construed some of the government's statements as urging the jury to "do its job" by returning a guilty verdict. Yes, the government urged the jury to do its job. And yes, the government urged the jury to find Polland guilty. However, nothing in its rebuttal argument linked the two ideas:

> The system works if everybody does their job, and you treat everybody the same. You do your job and you treat him just like you would treat the idiots and the boys as they were referred to and you'll find him guilty. (Tr. 816).

Here the government was suggesting that the jury would be doing its job by treating Polland the same as other criminal defendants. (Tr. 816). There is no reasonable inference that the government told the jury that its job was to convict Polland.

██ With respect to the second improper remark, Polland's counsel initiated the exchange by repeatedly suggesting that the government was somehow delinquent in not putting Muhammad on the stand. (Tr. 721–22). The government's reply that the defense could have called Muhammad as a witness was an invited response. *See United States v. Swiatek,* 819 F.2d 721, 730 (7th Cir.), *cert. denied,* 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987). Moreover, nothing in the government's response constituted new evidence, but was either established during the trial or could be inferred from the evidence. *See United States v. Jewel,* 947 F.2d 224, 230 (7th Cir.1991). In fact, the court gave a cautionary instruction that counsels' remarks at closing are not evidence.

██ Polland also asserts that the government "overresponded" to the defense's characterization of Muhammad and Johnson, who are black, as "boys." The prosecutor regarded this label, in contrast to the repeated references to "attorney Polland," as an attempt to solicit special consideration for Polland because of his status as a lawyer. By way of response, the prosecutor urged the jury to treat everyone fairly. (Tr. 816). There is nothing improper in the government's rebuttal. Polland also contends that the prosecutor claimed to have insight into the world of drug dealers and criminals superior to that of the jurors which led him to conclude that Polland was guilty. While the prosecutor may have implied some special knowledge, he in no way suggested that his insights as a public prosecutor should lead the jury to find Polland guilty. (Tr. 719–20). Consequently, this statement was not harmful or erroneous.

### E.

██ The only comment in the prosecutor's rebuttal argument that Polland objected to was the government's assertion that the attorney-client relationship between Polland and Muhammad was established on June 23, 1989, the day after Muhammad asked Polland to rectify the problem in the milk chute. We review such challenges to prosecutorial statements under the test elaborated in *Swiatek,* 819 F.2d at 730: "First, we deter-

mine whether, considered in isolation, the challenged remark was improper. If so, we reexamine the improper remark in light of the entire record to determine whether the remark deprived the defendant of a fair trial."

██ Polland contends that the prosecutor deliberately misstated the law on attorney-client privilege. Polland had presented testimony of his service as Muhammad's attorney prior to his appointment by the magistrate on June 23, 1989. The government, on the other hand, contends that the appointment by the magistrate is the relevant date in evaluating Polland's conduct here. Although exceedingly technical, the prosecutor's argument is not clearly improper. And even if we assume that the comment was improper, Polland was not deprived of a fair trial. Overruling the objection, the district court commented: "Counsel, this is the final argument. The jury again will use their collective recollections to recall the accuracy of the statements." (Tr. 805). In other words, the district court was reiterating that counsel were presenting argument, not evidence. During the presentation of evidence, both sides had ample opportunity to lay out their respective theories and contest the opposing one. As against the entire trial record, nothing in this brief exchange during closing argument leads us to conclude that the defendant was deprived of a fair trial.

### II.

### A.

Polland is also challenging the district court's enhancement of his sentence by two levels for obstruction of justice. *See* U.S.S.G. § 3C1.1. He argues that, if anything, he interfered with the investigation of another offense, the one resulting in the conviction of Muhammad. The district court explained that section 3C1.1 "does set forth as an example of enhancement the concealing or procuring another person to conceal evidence that is material to an official investigation or a judicial proceeding. The court feels that on the basis of that it could not find otherwise then that the defendant did obstruct justice insofar as the ongoing investi-

gation was concerned." (Sent. Tr. 33–34). On appeal, we will uphold the district court's sentence so long as it results from a correct application of the guidelines to factual findings that are not clearly erroneous. *United States v. Hubbard*, 929 F.2d 307, 310 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991).

■ Section 3C1.1 indicates that the obstruction of justice enhancement does not apply to any and all obstructive conduct that a defendant may have attempted or committed, but instead applies only to willful attempts "to obstruct or impede the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. In other words, section 3C1.1 does not contemplate enhancements for obstruction of justice if the relevant conduct impedes the investigation or prosecution of a separate crime. Therefore, while the guidelines themselves do not define the term "instant offense," it refers solely to the offense of conviction. This term does nevertheless pose a problem of construction in that it states that the enhancement applies only if the obstruction occurred during the investigation (for our purposes) of the instant offense. One could arguably construe this language as requiring that the obstruction have occurred *after* the authorities have begun investigating the offense of conviction.

The commentary to section 3C1.1, however, points to a more plausible interpretation. For example, the commentary indicates that enhancement is appropriate for conduct that includes "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding." U.S.S.G. § 3C1.1, comment 3(d). This application note then goes on to distinguish apparently obstructive conduct that is contemporaneous with an arrest, for which an enhancement is warranted only if that conduct materially hindered the investigation. In other words, the commentary clarifies that the significant factor is not merely the timing of the obstruction but rather whether the obstruction or attempt involves evidence that is ma-

terial to the investigation or prosecution of the offense of conviction.

■ The case law also supports this common-sense interpretation. Other circuits have affirmed enhancements awarded under section 3C1.1 when the defendant attempted to conceal evidence of the offense of conviction from authorities even though at the time of the obstructive conduct, the authorities were actually investigating an offense other than the offense of conviction. *See, e.g., United States v. Dortch*, 923 F.2d 629, 631–32 (8th Cir.1991) (section 3C1.1 enhancement proper after guilty plea to possession of cocaine with intent to distribute even though no ongoing investigation of that offense when defendant stopped for a traffic violation tossed package of cocaine out the window); *United States v. Roberson*, 872 F.2d 597, 609 (5th Cir.) (section 3C1.1 enhancement proper for credit card fraud for defendant who attempted to conceal stolen credit card after arrest for public intoxication), *cert. denied*, 493 U.S. 861, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989). Thus, the enhancement under section 3C1.1 applies to a defendant who obstructed or attempted to obstruct justice even if the obstruction occurred before the police or prosecutors began investigating or prosecuting the specific acts of the defendant.

■ Admittedly, Polland's situation is different as far as timing is concerned: His initial obstructive act was neither motivated by some other official investigation of him nor did it immediately precipitate such an investigation. However, as we have already indicated, our focus is not on timing but on materiality. His decision to arrange for the disposition of Muhammad's cocaine in the milk chute and subsequently to sell a portion of that cocaine implicated him in Muhammad's conspiracy. The jury concluded as much in finding Polland guilty of the count for conspiracy to possess with intent to distribute. Accordingly, that no investigation of Polland was under way or even contemplated at the time of his obstructive conduct does not alter the fact that the enhancement was for the instant offense.[1]

---

1. At trial Polland maintained that he was ethical- ly bound not to disclose the existence of the

Another aspect of this enhancement does give us pause. Under the present facts, Polland's decision to take possession of the cocaine and sell it amounts to a decision to join the conspiracy. That conduct alone would not be sufficient to warrant an enhancement for obstruction of justice because it is nothing more than participation in the conspiracy. But Polland also testified that he destroyed any cocaine that he did not personally use. (Tr. 618). According to the guidelines, destruction of material evidence to the instant offense *is* an obstruction of justice. However, the government never pressed the destruction of the cocaine as the relevant obstructive conduct. More importantly, the district court accepted the government's reasoning that concealment alone warranted this enhancement.[2] Since participation is distinguishable from obstruction, we do not believe that concealment of contraband, standing alone, by someone who joins a conspiracy during its investigation, prosecution, or sentencing is sufficient to merit an enhancement for obstruction of justice.

### B.

 Polland's final contention is that the district court erred in enhancing his base offense level for abuse of trust. Section 3B1.3 provides that a court may increase a defendant's offense level by two "if the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Furthermore, the commentary elaborates that "[t]he position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could easily have been afforded to other persons." *Id.*, comment n. 1.

Polland maintains that the district court's error lies in not acknowledging that he merely took advantage of an opportunity to gain access to the cocaine in the milk chute by virtue of his friendship with Muhammad and Hackbarth. Muhammad had shared this information with several other people, including non-attorneys, who also had the opportunity to take the cocaine from the milk chute. Therefore, his capacity as an attorney was not relevant to the disposition of the cocaine. The government, in opposing this argument, appears to be taking an inconsistent position. It contends that the abuse of trust occurred, or at least began, on June 22, 1989 while simultaneously maintaining that Polland was not appointed as Muhammad's attorney until June 23, 1989.

The district court, nevertheless, viewed skeptically the government's argument concerning the establishment of an attorney-client relationship on June 23. In fact, the court explained at sentencing that "it's obvious to the court that Mr. Polland would not have received the information regarding the two kilograms-plus of cocaine from Mr. Muhammad had it not been for the attorney/client relationship that existed there." (Sent. Tr. 55). In other words, the district court declined to embrace fully the government's reasoning but instead weighed Polland's abuse of the public trust. Clearly, as a criminal defense lawyer well-versed in the details of drug cases, Polland was in a unique position to oversee the concealment and distribution of his client's cocaine. Polland himself argued that his respect for the attorney-client relationship motivated him to conceal the existence of the cocaine, effectively acknowledging that his role as an attorney governed his conduct. And after Muhammad's conviction, Polland elected both to pursue Muhammad's appeal and to sell his co-

---

cocaine; therefore, his actions cannot be construed as obstructing justice. However, assuming that an attorney-client relationship between Polland and Muhammad in fact existed on June 22, 1989, the scope of the privilege obviously does not include disposing of or otherwise dealing drugs for a client. Polland himself acknowledged that he could have alerted law enforcement to the existence of the problem in the milk chute without violating the attorney-client privilege. (Tr. 642). Instead, he elected to join the

conspiracy by retrieving and selling Muhammad's cocaine while representing Muhammad.

2. In basing the enhancement on Polland's concealment of the cocaine, the district court did analogize this conduct to the shredding of documents whose existence the government was unaware of. (Sent. Tr. 34). We are unable to conclude from this single example that the district court relied on the destruction of the cocaine in imposing the two-level enhancement.

caine. Thus, continued contact with Muhammad as his attorney afforded Polland initial access to the cocaine and the expedient to dispose of it. Consequently, the district court's decision to grant the two-level increase for abuse of trust, in light of the particular facts of this case, was not clear error.

For the foregoing reasons, the conviction is AFFIRMED, the sentence is VACATED, and the case is REMANDED for resentencing on the issue of obstruction of justice.