**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**James LAURENZANA, Defendant–**
**Appellant.**

No. 96–3077.

United States Court of Appeals,
Seventh Circuit.

Argued April 9, 1997.

Decided May 5, 1997.

Estaban F. Sanchez, Elizabeth L. Collins, argued, Office of the U.S. Atty., Springfield, IL, for Plaintiff–Appellee.

David B. Mote and Richard H. Parsons, argued, Office of the Federal Public Defender, Springfield, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and CUMMINGS and EVANS, Circuit Judges.

CUMMINGS, Circuit Judge.

On November 15, 1995, a federal grand jury returned a two-count indictment charging defendant James Laurenzana with mail fraud and conspiracy to commit mail fraud, alleging that from about May 1993 to May 1995, Laurenzana conspired with others in the Central District of Illinois in a scheme to defraud merchants and businesses by passing worthless checks on Laurenzana's closed Springfield, Illinois, checking accounts, thereby obtaining money and goods without payment. On March 21, 1996, a second superseding indictment was filed against Laurenzana, which added a third count charging money laundering. The basis of the money laundering charge was the payment of his coconspirator's cash bond with proceeds from the fraudulent check scheme. The government alleged that Laurenzana had therefore knowingly conducted a financial transaction affecting interstate commerce with the proceeds of and in order to promote the unlawful activity of mail fraud. On April 24, 1996, following a jury trial, Laurenzana was convicted of mail fraud, conspiracy to commit mail fraud and money laundering. He was sentenced to 60 months' imprisonment on Counts 1 and 2 and 77 months on Count 3, all to be served concurrently.

Defendant makes several challenges regarding the proceedings in the district court. First, he alleges that the payment of his coconspirator Bryan Gilmore's cash bond had no effect on interstate commerce and was not a "financial transaction" as required by 18 U.S.C. § 1956(c), the money laundering statute. Second, defendant asserts that the evidence presented by the government at trial was not sufficient to support the mail fraud conviction. Third, he argues that the prose-

cutor's alleged misconduct during closing argument deprived him of his due process right to a fair trial. Next, defendant claims that his offense level for money laundering should not have been enhanced for obstruction of justice based on contact with government witness/co-conspirator Gilmore that occurred before defendant was charged with money laundering in the second superseding indictment. Finally, defendant contends that the district court erred in determining the amount of fraud loss for sentencing purposes, because he should not be held accountable for losses resulting from his co-conspirator's use of checks stolen from the defendant.

We affirm.

## I.

Defendant had many closed Springfield, Illinois, checking accounts, most of which had been closed for being excessively overdrawn. At trial the government contended that Laurenzana had provided checks on his closed accounts to Bryan Gilmore and that Gilmore, Gilmore's girlfriend Sheryl Hardwick and others passed these bad checks at numerous businesses. Testifying for the government, Gilmore admitted that he had passed bad checks that were given to him by Laurenzana as well as checks Gilmore stole from Laurenzana, using the proceeds of the latter checks for his own benefit, including the purchase of crack cocaine. Gilmore estimated that he was involved in cashing over 400 checks during the scheme. FBI Agent Donald Berecz testified at trial that government investigators had not identified which checks had been given to Gilmore by Laurenzana and which checks Gilmore had stolen from Laurenzana.

In several instances, after receiving letters from businesses that had accepted bad checks drawn on his closed accounts, Laurenzana mailed a copy of a letter to the businesses (or their collection agencies) which stated that his checks had been stolen and that he was not responsible for those checks. The letter was a form letter from the Springfield, Illinois, Police Department and was used to advise people that the police have possession of abandoned, lost, stolen or otherwise illegally possessed property, and it concerned a check passed by an earlier member of the conspiracy to a grocery store; the letter was not related to any of the bad checks in question, despite Laurenzana's attempt to create that impression. He also included a note to the businesses that stated that the checks were stolen and that some people had been caught and prosecuted. In some cases, he also included an affidavit attesting that he did not sign, nor authorize anyone else to sign, the checks and further "that he/she received no benefit or value from the proceeds of said check, and no part thereof was applied to any use or purpose on his/her behalf." In at least two instances, Laurenzana sent through the mail to the Cass County and Bond County State's Attorneys in Illinois an affidavit similar to ones sent to the businesses after more Laurenzana checks were passed by Gilmore at local businesses.

At one point during the period in question, Gilmore was jailed for passing bad checks, and Laurenzana bailed him out, paying $250 as bond, which the Deputy Sheriff mistakenly accepted rather than the correct amount of $2,500. Gilmore was released, but after the mistake was discovered, Gilmore was again arrested and Laurenzana paid the additional $2,250 to bail him out. The money used to post bail on these two occasions was part of the proceeds of the bad check cashing scheme and was deposited by the Clerk's Office in a bank that was a part of the federal banking system.

Gilmore was arrested again in Decatur, Illinois, in May 1995. Laurenzana visited him in the Decatur, Illinois, jail and put money in his jail account. They discussed whether Gilmore was going to testify against Laurenzana. Following that discussion, Gilmore pled guilty to conspiracy to commit mail fraud, and in his plea agreement Gilmore agreed to provide information about Laurenzana's involvement. Laurenzana also visited Gilmore when he was at the Graham Correctional Center following his guilty plea and sent money to his prison account. He advised Gilmore during the visit that someone from the Public Defender's Office would be coming to interview him. Prior to the time these discussions took place, Laurenzana himself had been ar-

rested and was released on a recognizance bond with a condition that he avoid all contact with government witnesses, including Gilmore. Apparently Gilmore assured Laurenzana repeatedly during the Graham visit that he was not going to testify against Laurenzana, and when a defense investigator for Laurenzana came to take Gilmore's statement, Gilmore told him that Laurenzana was an innocent man and that Gilmore had stolen a bunch of checks. Gilmore later testified that his statement to the defense investigator was not the truth.

## II.

Laurenzana first argues that his payment of co-conspirator Gilmore's $2,500 cash bond had no effect on interstate commerce and was not a "financial transaction" as required by 18 U.S.C. § 1956(c)(4), the money laundering statute. Laurenzana maintains that his payment of Gilmore's bond resulted in three distinct transactions: (i) Laurenzana paid the cash to the Deputy Sheriffs; (ii) the Sheriff's Office turned over the money it collected to the Morgan County Circuit Clerk's Office; and (iii) the Clerk's Office deposited the money in a bank. He asserts, accordingly, that his payment of the bond, which was only the first of the three transactions, did not affect interstate commerce.

■ Laurenzana's argument, in effect, is a claim that the government did not meet its burden of proof on the interstate commerce issue and is a challenge to the sufficiency of the evidence presented by the government in connection with his money laundering conviction. This Court will uphold the conviction under the money laundering statute "if the evidence, viewed in the light most favorable to the government, establishes that any rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Kaufmann*, 985 F.2d 884, 892 (7th Cir.1993), certiorari denied, 508 U.S. 913, 113 S.Ct. 2350, 124 L.Ed.2d 259; see also *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560.

The money laundering statute under which defendant was convicted, 18 U.S.C. § 1956, provides:

§ 1956. Laundering of monetary instruments

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction . . . —

> (A)(i) with the intent to promote the carrying on of specified unlawful activity;

\* \* \* \* \* \*

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

\* \* \* \* \* \*

(c) As used in this section—

\* \* \* \* \* \*

(4) the term "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce . . . or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree. . . .

■ Although Laurenzana would like our analysis to stop with his delivery of cash to the correctional officers, we cannot do so, because neither commerce nor the flow of cash is a static process. This Court has held that the connection to interstate commerce required for a money laundering offense need only be "incidental" to the transaction or that interstate commerce must be affected only in "some" manner. See *United States v. Koller*, 956 F.2d 1408, 1412 (7th Cir.1992); see also *United States v. Kelley*, 929 F.2d 582, 586 (10th Cir.1991), certiorari denied, 502 U.S. 926, 112 S.Ct. 341, 116 L.Ed.2d 280 ("[T]he 'in or affecting interstate commerce' requirement has been broadly read and . . . a 'minimal effect' on interstate commerce is sufficient to establish federal jurisdiction.").[1]

---

1. *United States v. Koller*, 956 F.2d 1408, cited by defendant, is not availing. In fact, the case sup-

ports the government's theory. In *Koller*, this Court found that the defendant had executed two

In *United States v. Kaufmann,* 985 F.2d at 892 n. 3, this Court found that a transaction which involved the sale of an automobile fit within the definition of "financial transaction" in the money laundering statute, because the sale was made with cash and because it would result in "some effect" on interstate commerce.

There is no relevant distinction between the facts in the cases cited above and the transaction at issue in this case. The money Laurenzana delivered to the officers did, and in the ordinary course of business would be expected to, enter the flow of commerce. It was both incidental to the transaction and had some effect on interstate commerce. Accordingly, the government presented sufficient evidence that such payment was a "financial transaction" within the meaning of the money laundering statute.

### III.

Defendant's next argument is that the evidence presented by the government at trial was not sufficient to support a mail fraud conviction. At the heart of Laurenzana's argument is his assertion that the government has failed to prove an element of the mail fraud offense, *viz.*, that Laurenzana's mailings to the State's Attorneys and to various merchants and collection agencies were in furtherance of the scheme to defraud. He contends that the government did not prove that these mailings related to checks Laurenzana gave to Gilmore as opposed to checks Gilmore and others stole from Laurenzana. He also directs this Court's attention to the fact that Donald Berecz, the government's case agent, testified that he did not attempt to determine which checks had been stolen from Laurenzana and which checks Laurenzana had given to Gilmore.

■ Laurenzana has a heavy burden with this argument, because "[o]nly where the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *United States v. Moralez,* 964 F.2d 677, 679 (7th Cir.1992), certiorari denied, 506 U.S. 903, 113 S.Ct. 293, 121 L.Ed.2d 217 (citations omitted). This Court will draw all reasonable inferences in favor of the government. See *United States v. Douglas,* 874 F.2d 1145, 1151 (7th Cir.1989), certiorari denied, 493 U.S. 841, 110 S.Ct. 126, 107 L.Ed.2d 87. In reviewing a conspiracy conviction, we will sustain the jury's verdict if, after viewing the evidence in the light most favorable to the government, there is substantial evidence to support that verdict. See *United States v. Scop,* 940 F.2d 1004, 1010–1011 (7th Cir. 1991).

■ In order to sustain a conviction under the federal mail fraud statute, the government must introduce evidence sufficient to establish the "use of the mails in furtherance of the fraudulent scheme." *United States v. Hickok,* 77 F.3d 992, 1003 (7th Cir.1996), certiorari denied, — U.S. —, 116 S.Ct. 1701, 134 L.Ed.2d 800. Likewise, in order to convict a defendant of conspiracy to commit mail fraud the government must show that Laurenzana agreed to participate in a scheme to defraud in which it was rea-

---

separate transactions: the purchase of a money order with proceeds of illegal activity and the delivery of the money order to the probation office in payment of restitution. We did not focus on the flow of money following the payment of the restitution, but instead looked to the purchase of the money order. Although the use of a financial institution in interstate commerce when purchasing the money order occurred *before* the transaction which formed the basis of the conviction—*i.e.*, the payment of restitution—the Court found that the use of the financial institution still was incidental to the delivery of the money order and was a sufficient predicate for federal jurisdiction. *Id.* at 1412. We stated that:

The statute does not ... literally require that the use of the financial institution with the

interstate nexus be a part of, contribute to, or facilitate the design to conceal, and since the purpose of the interstate commerce nexus is to provide a predicate for federal legislative jurisdiction, we think that the use of the financial institution involved in the transaction may be incidental, as it was here, and need not be shown to have been a part of, contributed to, or facilitated the design to conceal.

*Id.* In this case, there is ample evidence that the money at issue was deposited in a financial institution which affected interstate commerce. Since, under this Court's reasoning in *Koller,* the "interstate commerce" nexus need only be incidental to and not an integral part of the transaction, there is sufficient evidence to support Laurenzana's money laundering conviction.

sonably foreseeable that the mails would be used in furtherance of the fraudulent scheme. See *United States v. Shelton,* 669 F.2d 446, 451 (7th Cir.1982), certiorari denied *sub nom., Bledsoe v. United States,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454. The essential question, then, is not whether the underlying checks were given to or taken by Gilmore, but whether Laurenzana's mailings were in furtherance of the scheme to defraud, and this Court reads the "in furtherance" requirement of the mail fraud statute broadly. See *United States v. Koen,* 982 F.2d 1101, 1107 (7th Cir.1992). The mailings need not be an essential part of the scheme, but they must be incident to an essential part of the scheme. See *Schmuck v. United States,* 489 U.S. 705, 710–711, 109 S.Ct. 1443, 1447–1448, 103 L.Ed.2d 734. The mailings must be "sufficiently closely related" to the illegal scheme so that it can be said that they furthered its accomplishment. See *Koen,* 982 F.2d at 1107.

The Supreme Court's decision in *Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734, is instructive on this issue. In that case, the defendant had been charged with multiple counts of mail fraud relating to a used car scheme in which he purchased used cars, rolled back their odometers, and then sold the cars to retail dealers at prices artificially inflated by the lower mileage readings. The unknowing dealers, who were relying on the altered odometer readings, resold the cars to customers at inflated prices and consummated the transactions by mailing title application forms to the State of Wisconsin on behalf of the buyers. Defendant claimed that the mailing of the title applications was not in furtherance of the fraudulent scheme and, therefore, did not satisfy the mailing element of the mail fraud statute. The Supreme Court found that the mailings at issue did satisfy the mailing element of the crime of mail fraud, concluding that they were necessary to the successful passage of title to the cars, which in turn was essential to the perpetuation of the scheme to defraud, because if title had not been passed to the cars, the defendant's relationship with the dealers would have been jeopardized and he needed that relationship to continue his scheme. See *Id.* at 711–712, 109 S.Ct. at 1448–1449.

■ The purpose and role of Laurenzana's mailings in the scheme at issue in this case is very similar to that of the mailings in *Schmuck.* Regardless of whether the checks in question were stolen or given, Laurenzana's mailings were in furtherance of the scheme to defraud. He knew that Gilmore was responsible for passing the underlying checks, and as a result of Laurenzana's correspondence with the State's Attorneys and certain businesses, there was no further action against Laurenzana or his co-conspirators. It was essential to the scheme that Laurenzana and Gilmore were not held responsible for the checks. As an ongoing fraudulent venture, if Laurenzana wanted to continue with the scheme—which it appears he did because he kept providing checks to Gilmore—Laurenzana had to keep the businesses and prosecuting authorities away from himself and Gilmore. He did so for some time. There was abundant evidence to support Laurenzana's mail fraud conviction.

## IV.

Laurenzana argues that the prosecutor's alleged misconduct during closing argument deprived him of his due process right to a fair trial. He appears to be challenging the following:

1. In response to defendant's closing argument that if the jury could not determine whether the mailings had been in response to checks Laurenzana gave to Gilmore then they should acquit because the government had not proven a violation of federal law, the prosecutor made the following remarks:

   Well, ladies and gentlemen, I would submit to you, and I invite Mr. Parsons [defense counsel], if Mr. Parsons ever wants to become a prosecutor and investigator, he can do so. And then he can make a decision as to which crimes merit this Court's attention and which crimes do not merit this Court's attention. But as of now, this is a crime in federal court, and that does not diminish Mr. Laurenza-

na's guilt based upon all of the evidence.... The case is a federal case because there was a fraud involved and because the mails were used. Congress has told us that is a federal crime. We are charged with enforcing federal law, and that's the end of that. Don't be confused by Mr. Parsons. Don't try—he is trying to change your role in this proceedings from that of a juror to that of a judge or prosecutor. Don't let him do that. (4/24/96 Tr. 71–72.)

Laurenzana argues that, in effect, the prosecutor improperly was telling the jurors that they did not have to determine an element of the crime because he, as a federal prosecutor, decided to pursue this case and because it was being tried in federal court.

2. Defendant asserts that the prosecution committed misconduct when it invited jurors during rebuttal argument to consider how they would feel if they were victims of a crime (4/24/96 Tr. 75), thus improperly encouraging the jury to decide Laurenzana's guilt or innocence on matters other than the evidence produced at trial.

3. Laurenzana claims—citing *United States v. Auerbach*, 913 F.2d 407, 418–419.(7th Cir.1990)—that the prosecution also improperly vouched for the credibility of its witnesses, stating: "But are they telling the truth? Yes. Yes, they are." (4/24/96 Tr. 79.)

4. Laurenzana also challenges the "excessive" length of the prosecutor's rebuttal closing, which was approximately equal in length to the prosecution's first closing argument and the defense's closing, contending that the length constituted an abuse of rebuttal closing and prejudiced Laurenzana because his counsel's remarks were likely forgotten by the time the jury heard the prosecution's rebuttal closing. (Def.Br.43–44.)

■ Because Laurenzana made no objections to any of the government's closing argument, the prosecutor's alleged improprieties will be reviewed for plain error affecting substantial rights. See *United States*

*v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776–1777, 123 L.Ed.2d 508; *United States v. Catalfo*, 64 F.3d 1070, 1080 (7th Cir.1995), certiorari denied, — U.S. ——, 116 S.Ct. 1683, 134 L.Ed.2d 784. The discretion to correct plain error should be employed in those circumstances in which a miscarriage of justice would otherwise result, namely, in those cases in which the error has affected the outcome of the district court proceedings. *Olano*, 507 U.S. at 734–736, 113 S.Ct. at 1777–1779. In analyzing a claim of prosecutorial misconduct during closing arguments, this Court first considers whether the comment was improper and then evaluates the remark to determine whether it deprived the defendant of a fair trial. See *United States v. Patterson*, 23 F.3d 1239, 1247 (7th Cir. 1994), certiorari denied, 513 U.S. 1007, 115 S.Ct. 527, 130 L.Ed.2d 431.

■ Although some of the statements cited above were improper or at least of questionable propriety, we agree with the district court that neither the remarks, even if taken all together, nor the length of rebuttal deprived Laurenzana of a fair trial or resulted in a miscarriage of justice.

## V.

Next, defendant claims that his offense level for money laundering should not have been enhanced for obstruction of justice based on contact with Gilmore that occurred before defendant was charged with money laundering in the second superseding indictment. Laurenzana argues that although his visits to Gilmore in the Graham Correctional Center were an appropriate basis for an obstruction enhancement on his mail fraud counts, the visits cannot be a basis for enhancement on the money laundering charge because they did not take place "during the investigation, prosecution, or sentencing of the instant offense," here money laundering, as required by U.S.S.G. § 3C1.1. The district court found that Laurenzana's attempt to influence Gilmore's testimony regarding the check cashing scheme also impacted the money laundering offense and was therefore an appropriate basis for the § 3C1.1 enhancement.

We agree with the district court. In *United States v. Polland,* 994 F.2d 1262, 1269 (7th Cir.1993), certiorari denied, 510 U.S. 1136, 114 S.Ct. 1115, 127 L.Ed.2d 425, this Court held specifically that § 3C1.1 does not require that the obstruction at issue occur after the authorities have begun investigating the offense of conviction. We determined instead that the significant factor is "whether the obstruction or attempt involves evidence that is material to the investigation or prosecution of the offense of conviction." *Id.* at 1269. As applied to this case, Laurenzana's attempt to influence Gilmore's testimony on the check cashing scheme involved evidence material to his money laundering conviction. Accordingly, the § 3C1.1 enhancement was proper.

## VI.

The district court increased Laurenzana's offense level under U.S.S.G. § 2F1.1(b)(1)(G) by six points because it determined the amount of loss from the bad check fraud was greater than $70,000, but less than $120,000. The court found that under U.S.S.G. § 1B1.3(a)(1)(A) and (B), Laurenzana was liable for all the checks Gilmore cashed.[2] Defendant asserts that for sentencing purposes he should not be held accountable for losses resulting from his co-conspirator's use of checks stolen from him.

The district court's factual findings of loss for purposes of § 2F1.1 and § 1B1.3 were not clearly erroneous, which is the standard that Laurenzana must meet. See *United States v. Akindele,* 84 F.3d 948, 959 (7th Cir.1996); *United States v. Ross,* 77 F.3d 1525, 1552 (7th Cir.1996). The evidence establishes that Laurenzana aided and abetted all of Gilmore's check cashing activities, both with given and stolen checks, within the meaning of clause (A) of § 1B1.3(a)(1) by providing a place for Gilmore to store merchandise, providing information for Gilmore

to get a false I.D. and submitting false affidavits and statements so that neither Gilmore nor Laurenzana would be implicated in cashing the checks. In addition, pursuant to clause (B) of § 1B1.3(a)(1) Laurenzana is accountable for losses reasonably foreseeable by him, and Gilmore's taking of extra checks was not only reasonably foreseeable, but Laurenzana was actually aware that Gilmore had taken some of his checks and he still continued to give Gilmore checks up to the time when Gilmore was finally arrested and not released. See *Akindele,* 84 F.3d at 959; *United States v. Smith,* 897 F.2d 909, 910–911 (7th Cir.1990).

## VII.

For the reasons discussed above, the decision of the district court is AFFIRMED.

---

2. U.S.S.G. § 1B1.3(a)(1) directs that specific offense characteristics (such as the amount of loss) are to be determined on the basis of:

"(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense...."