[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 17, 2001
THOMAS K. KAHN
CLERK

_____

No. 00-13390

_____

D.C. Docket No. 99-00753-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARMANDO OLIVEROS,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

**(December 17, 2001)**

Before EDMONDSON and CARNES, Circuit Judges, and MUSGRAVE[*], Judge.

_____

[*] Honorable R. Kenton Musgrave, Judge, U.S. Court of International Trade, sitting by
designation.

CARNES, Circuit Judge:

Armando Oliveros was convicted of six counts of money laundering under 18 U.S.C. §1956(a)(3)(B) and sentenced to 97 months on each count to run concurrently. In this appeal he raises three contentions that merit discussion. One concerns the sufficiency of the evidence to prove the jurisdictional element of the money-laundering crime for which he was convicted. Oliveros' other two contentions concern the informant who was the principal witness against him. Oliveros complains about the district court's refusal to permit him to present expert testimony about immigration law in order to prove that the informant witness had received more assistance from the government than he admitted. He also complains that the government violated Giglio v. U.S., 405 U.S. 150, 154, 92 S. Ct. 763, 766 (1972), by making false statements to the jury about the assistance that the informant witness had received in return for his cooperation. For the reasons that follow, we reject Oliveros' contentions and affirm his conviction.

## I. FACTS

Armando Oliveros, a lawyer who at the time of his arrest was vice-mayor of the City of South Miami, was convicted of six counts of money laundering. The conviction was the culmination of an FBI sting orchestrated by the Public Corruption Task Force, a combined federal-state operation.

2

The government's central informant in the sting was Julian Casanova, a Cuban national, long-time drug importer, and former client of Oliveros. A career criminal, Casanova had last been arrested in 1992 for drug trafficking he engaged in while serving as an United States Customs informant, and subsequent to that arrest he had entered into a plea agreement in which he pledged more cooperation. Oliveros briefly represented Casanova in that criminal matter, and he also handled some related civil matters for him. While Casanova was serving his sentence for that crime, he continued to cooperate with law enforcement, providing information about drug trafficking in the Miami area.

Still cooperating with law enforcement after his release, Casanova informed Detective Omar Carillo of the Miami-Dade Police Department that Oliveros had laundered money for Casanova in the past. Carillo and FBI Special Agent Talarah Gruber, who were both on the Public Corruption Task Force, planned an operation targeting Oliveros in which Casanova was to be the confidential informant. The sting began with Casanova contacting Oliveros by phone. In that initial conversation, as he had been instructed to do by the FBI, Casanova told Oliveros that he was back in business trafficking narcotics. That conversation was unrecorded, however, and at trial Oliveros disputed what was said during it. The first face-to-face, recorded meeting between Casanova and Oliveros was on August

11, 1999 when the two of them met at Casanova's house. They discussed Oliveros' fee for money laundering, which was ten percent, and how Oliveros would "clean" the money by using the escrow account of his law practice.

The money-laundering scheme entailed a series of cash-for-checks exchanges. On three occasions – August 18, September 3, and September 23, 1999 – Casanova gave Oliveros $50,000 in cash, which the FBI had withdrawn from its bank account at SunTrust Bank in Miami. Then, on three corresponding occasions – August 25, September 13, and October 4– Oliveros gave Casanova $45,000 in checks reflecting the amount of the laundered cash less Oliveros' commission. The August 25 and September 13 checks were drawn on Oliveros' escrow account. On October 4, Oliveros gave Casanova three checks totaling $45,000, two of which were drawn on Oliveros' escrow account and one of which was drawn on an account by the name of Union Bailbonds, Union Bailbonds being a company operated by Oliveros' brother-in-law. After each transaction, the FBI deposited the checks Casanova received from Oliveros into the FBI's SunTrust account.

Oliveros was charged by information with six counts of money laundering.[1] Counts I, III, and V of the information charged him with receiving $50,000 in cash,

[1] Oliveros consented to being charged by information and executed a written waiver of indictment.

which Casanova had represented to Oliveros to be the proceeds of illegal activity. Counts II, IV, and VI charged Oliveros with delivering to Casanova the "cleaned" $45,000 in checks.

At trial Oliveros claimed that Casanova had entrapped him, arguing that Casanova pressured and tricked him. He said that he did not know the cash was purportedly the proceeds of narcotics trafficking the first time he accepted cash from Casanova. It was not until the second time that he accepted cash that he thought that it might be "dirty," but by that point, Oliveros stated he felt obligated to help his friend. Casanova testified that he had told Oliveros the money was from drug trafficking before the first time he gave cash to him. Oliveros attempted to impeach Casanova by focusing on his potential bias resulting from the favorable immigration treatment that he had received in return for his participation in the sting and his testimony at trial. Oliveros contended that Casanova was treated more favorably than either the government or Casanova revealed. After a nine-day trial, the jury convicted Oliveros of all six counts, and the district court sentenced him to 97 months' imprisonment on each count, to run concurrently. Oliveros timely filed this appeal.

## II. DISCUSSION [2]

### A. SUFFICIENCY OF THE EVIDENCE TO PROVE THE INTERSTATE COMMERCE ELEMENT OF MONEY LAUNDERING

Oliveros contends that the government did not prove that the money laundering transactions for which he was convicted had an interstate commerce nexus. Under §1956(c)(4)(B), which sets out one of the alternative jurisdictional elements of the money laundering statute, the government must prove both that a financial institution was engaged in or affected interstate commerce, and that the transaction involved the use of the financial institution. Oliveros does not dispute that the evidence was sufficient to prove that SunTrust Bank, from which the "dirty" cash was withdrawn and into which the "clean" checks were deposited, is a financial institution engaged in interstate commerce.[3] Instead, he contends that the transactions (his receipt of the cash and delivery of the checks) were not "financial transactions" as that term is defined in 18 U.S.C. §1956(c)(4), because they did not involve the financial institution (SunTrust).

---

[2]We discuss Oliveros' three primary claims. We have also carefully considered his claim that the government violated the bribery statute by rewarding Casanova for his testimony, his related due process claim, his evidentiary claims, and his claim that the district court misapplied the Sentencing Guidelines, and we reject them without further discussion.

[3]The government introduced as evidence at trial documents showing that the bank was a member of the Federal Deposit Insurance Corporation. See United States v. Peay, 972 F.2d 71, 74-75 (4th Cir. 1992)(proof that a bank's accounts are federally insured is sufficient to establish that it is engaged in interstate commerce); United States v. Leslie, 103 F.3d 1093, 1103 (2d Cir. 1997)(same).

Oliveros bases his argument that the bank was not involved in the transactions on United States v. Kramer, 73 F.3d 1067, 1072 (11th Cir. 1996). In that case, we held that under the money-laundering statute, "each transaction or transfer of money constitutes a separate offense." According to Oliveros, the money-laundering scheme which formed the basis of his conviction consisted of several distinct offenses (some of which were not charged): (i) his accepting the cash from Casanova; (ii) his depositing the cash in a bank account; (iii) his delivering the check to Casanova; and (iv) the FBI's depositing the check into its account. Because Oliveros was only charged with receiving the cash from and delivering the checks to Casanova, those particular transactions must have their own interstate commerce nexus and cannot share a nexus with other distinct offenses within the same money-laundering scheme. Or so Oliveros argues.

We disagree. The statute defines a "financial transaction" as a "transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." 18 U.S.C. §1956(c)(4)(B) (emphasis added). In interpreting a statute, we adhere to its plain meaning. See CBS, Inc., v. Primetime 24 Joint Venture, 245 F.3d 1217, 1222 (11th Cir. 2001); United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998)(en banc). The plain meaning of this statute does not require that use of the financial

institution be an integral or essential part of the particular transaction which forms the basis of the conviction, but only that the transaction involve the use of the institution in some way. Because the money-laundering statute reaches the full extent of Congress' Commerce Clause power, see United States v. Peay, 972 F.2d 71, 74 (4th Cir. 1992); see also Stirone v. United States, 361 U.S. 212, 215, 80 S. Ct. 270, 272 (1960) (interpreting the Hobbs Act from which the money-laundering statute derived its language), the government satisfies the interstate commerce requirement under §1956(c)(4)(B) when it proves that a financial institution with an interstate nexus was, at least, incidentally involved in the transaction charged in the indictment. Incidental involvement or use is enough.

Case law in other circuits supports our interpretation of §1956(c)(4)(B). See United States v. Koller, 956 F.2d 1408, 1410-12 (7th Cir. 1992) ("The statute does not, however, literally require that the use of the financial institution with the interstate commerce nexus be a part of, contribute to, or facilitate the design to conceal, and since the purpose of the interstate commerce nexus is to provide a predicate for federal legislative jurisdiction, we think that the use of the financial institution involved in the transaction may be incidental, as it was here, and need not be shown to have been a part of, contributed to, or facilitated the design to conceal."); see also United States v. Laurenzana, 113 F.3d 689, 692 & n.1 (7th Cir.

8

1997) (reiterating "that the connection to interstate commerce required for a money-laundering offense need only be 'incidental' to the transaction" and holding that a subsequent deposit of the check representing the clean money is sufficient for the interstate commerce nexus); United States v. Richard, 234 F.3d 763, 767-68 (1st Cir. 2000) (in the context of construing the term "monetary transaction" under 18 U.S.C.§ 1957(f)(1), which includes any "financial transaction" under §1956(c)(4)(B), holding that the delivery of a criminally derived check to a third person so that the third person can deposit the check is a transaction involving the use of a financial institution).

In this case the government's proof satisfied §1956(c)(4)(B) as to each of the transactions for which Oliveros was charged and convicted. With respect to Counts I, III, and V, which charged Oliveros with receiving the cash from Casanova, the government proved that the bank was involved because the evidence established that before each of the exchanges the FBI withdrew the cash used from the bank. Even though the withdrawal from the bank occurred before the transaction that formed the basis of Oliveros' conviction on Counts I, III, and V (the receiving of the cash), the financial institution was involved at least incidentally in Oliveros' receiving the cash, and that degree of involvement is a sufficient predicate for federal jurisdiction. See Koller, 956 F.2d at 1412-13 (holding that the interstate

9

commerce requirement was satisfied by evidence that the defendant used a bank in interstate commerce before committing the transaction which formed the basis of his conviction, even though the use of the bank did not itself violate the money laundering statute).

In a similar fashion, the FBI's depositing the checks Oliveros delivered to Casanova supplies the interstate commerce nexus for Counts II, IV, and VI of the information, which charged Oliveros with delivering the checks to Casanova. While deposit of the checks occurred after the transactions themselves, the deposit was at least incidental to delivery of the checks and the success of the transactions. See Laurenzana, 113 F.3d at 692 ("Although [the defendant] would like our analysis to stop with his delivery of [money] to the [law enforcement] officers, we cannot do so, because neither commerce nor the flow of cash is a static process."); see also Richard, 234 F.3d at 767-68 (finding that the subsequent deposit of a check by a third person is sufficiently connected to the delivery and acceptance of the check to satisfy §1956(c)(4)(B)).

Accordingly, we hold that the government's evidence did prove the jurisdictional element of the money-laundering statute for each of the transactions which formed the basis of Oliveros' conviction.

B.  THE FAVORABLE IMMIGRATION TREATMENT OF CASANOVA

10

At trial, Oliveros expended a lot of effort attempting to discredit Casanova, the FBI's informant and the principal witness for the government. Oliveros emphasized Casanova's long criminal history, and he focused attention on the favorable treatment Casanova had received in connection with his immigration status in return for his participation in the sting and his testimony at trial. The government and Casanova freely admitted that Casanova had received some favorable treatment in exchange for his cooperation and participation, but Oliveros contended that because of the way immigration law works, what Casanova had received was more beneficial to him than either the government or Casanova admitted.

Because Casanova was a Cuban national and a felon convicted of an aggravated felony,[4] there was a detainer order outstanding against him, and he faced a deportation hearing when he was released from prison in November of 1998. In return for the assistance that Casanova was providing to law enforcement in narcotics cases other than this one, officials succeeded in having the detainer order lifted, and as a result Casanova began serving his period of supervised release instead of being detained. However, he still faced deportation.

---

[4]Casanova was convicted of trafficking narcotics, which 8 U.S.C. § 1101(a)(43)(B) defines as an aggravated felony.

As a result of changes brought about by the Illegal Immigrant Removal and Immigrant Responsibility Act (IIRIRA), Casanova's deportation could not be waived even after he had agreed to participate in the sting operation. See 8 U.S.C. §1229b(a)(3). At the mandated deportation hearings, foreign nationals in Casanova's position receive orders of removal, which strip them of their permanent resident status. After the deportation hearing, they are detained for up to ninety days while the INS attempts to remove them. See 8 U.S.C. § 1231(a)(1)(A) ("[W]hen an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days...."). However, few Cuban nationals whom this country attempts to deport because they have been convicted of crimes are accepted by Cuba, which apparently takes the position that it has enough criminals already.

Casanova was not detained at all, however, because the FBI wanted to avoid any disruption of its sting operation. To prevent Casanova's detention, the FBI got the INS to issue Casanova an "advanced parole"[5] which allowed him to enter the country for a limited time under the supervision of the FBI but which did not affect

[5]The IIRIRA prescribes certain ways aliens, otherwise ineligible to enter the United States, can enter the country. One such method is the use of an advanced parole in cases where the alien's presence in the country will be "a significant public benefit." 8 U.S.C. §1182(d)(5)(A). The alien is given an "[a]dvance authorization," see 8 C.F.R. §212.5(f), which the parties in this case have called an "advanced parole." That is what Casanova received.

his permanent immigration status. While negotiating with the INS over the "advanced parole," the FBI got Casanova's deportation hearing delayed. When Casanova finally did appear at his deportation hearing, the immigration judge ordered him removed from this country to Cuba, which was tantamount to ordering him detained in a INS facility for ninety days. However, instead of taking Casanova to an INS facility, the FBI took him to the Bahamas, and then using the advanced parole authorization that it had obtained from the INS for him, brought Casanova back into the United States. So, the FBI's intervention on Casanova's behalf benefitted him because it resulted in his not being detained for the 90-day period.

All of what we have described to this point about the treatment Casanova received, what the government did for him in return for his participation in the sting and testimony, was disclosed to the defense before trial and brought out to the jury. At trial the government admitted its actions on behalf of Casanova and contended that they were authorized by law.

The dispute between the parties is not about what we have described so far. It is twofold. First, Oliveros contends, albeit half-heartedly, that Casanova had been given or promised an S-Visa. Besides advanced parole, another possible method law enforcement has used in the past in order to gain entry for an otherwise

inadmissible alien is to obtain for him a special visa. The categories of aliens eligible for special visas are listed in 8 U.S.C. §1101(a)(15) and include aliens who are informants and cooperators. Id. at §1101(a)(15)(S). The visa for informants derives its name, "S-Visa," from the fact that it is contained in subsection S of that part of the statutory provision. At trial, Oliveros contended that an S-Visa would allow Casanova to stay in the United States permanently, but the government and Casanova unequivocally denied that he had received or been promised one, and there is no evidence at all to contradict those denials. Agent Gruber was asked about S-Visas and stated that he had been told that they were no longer available under the law. Oliveros contends that they are still available, and that is the first dispute.

The second dispute is about the benefit or value to Casanova of what the government admittedly did do for him. It is about what would have happened to Casanova if the government had not intervened on his behalf in return for his cooperation and testimony – what would have happened to Casanova after the 90-day detention period that he was able to avoid because of the FBI's intervention on his behalf. Oliveros contends that after the 90 days of detention had passed, a three-member board, the "Cuban Review Panel," established by 8 C.F.R. §212.12(d)(1), would have reviewed Casanova's case and considered whether to

14

release him, weighing several factors, including his future criminal threat and his past criminal history. See 8 C.F.R. §§212.12 (d)(2)(iii) & (iv) and 212.12(d)(3)(ii). Given Casanova's criminal history, Oliveros argues that Casanova likely would have been indefinitely detained. On the other hand, Agent Gruber testified at trial that her understanding was that Casanova would have been released from detention by the INS after 90 days. Casanova testified that although he had heard of people being indefinitely detained, he thought that in most cases the detention period was for was 90 days, which is what he thought he likely would have faced but for the FBI's intervention.

### 1. The Exclusion of Oliveros's Expert Witness

To prove that S-Visa's were still available and that Casanova would have faced an indefinite detention but for the FBI's intervention on his behalf, Oliveros wanted to call an attorney who specialized in immigration cases to testify as an expert witness about immigration law. The district court refused to allow the attorney to testify, explaining that the extent of Casanova's benefits had been fully explored and that neither the FBI nor Casanova believed S-Visas were an option. Oliveros contends that this ruling was reversible error, arguing that the expert witness' testimony was relevant to show the extent of Casanova's bias.

The district court did not abuse its discretion in excluding the attorney's testimony to the extent that it was directed at establishing whether S-Visas were available in 1999 and what the statutory prescribed immigration procedure was for Cuban nationals. Domestic law is properly considered and determined by the court whose function it is to instruct the jury on the law; domestic law is not to be presented through testimony and argued to the jury as a question of fact. See 2A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE §432 (3d ed. 2000); cf. FED. R. CRIM. P. 26.1 (concerning foreign law); United States v. McClain, 593 F.2d 658, 669-670 (5th Cir. 1979) (reaffirming that the proper procedure is for the judge rather than the jury to determine questions of foreign law). In order to establish that the law still provided for S-Visas and to establish the legal process and consequences that Oliveros would have faced without intervention after the prescribed 90-day detention period had run, Oliveros should have presented the matter (including the expert witness opinions, if any, that might have been permissible) to the district court and asked the court to instruct the jury on the law. He did not do that.

Oliveros proffered that his immigration-law expert also would have testified that given his own experience representing clients before INS review boards, under the statutorily prescribed procedure, Casanova as an aggravated felon likely would

have faced a lengthy detention– in his opinion "years of detention"– much longer than the ninety days that Agent Gruber and Casanova testified they believed he would have faced. Assuming that this would have been a proper subject for expert testimony, we still conclude that the district court did not abuse its discretion in excluding the testimony. See United States v. Sheffield, 992 F.2d 1164, 1167 (11th Cir. 1993) (abuse of discretion standard).

Oliveros argues that the proffered expert testimony is relevant to the issue of Casanova's bias, because it shows the extent of the benefit he actually received for cooperating and testifying. When it comes to a witness' motive to lie, however, what counts is not the actual extent of the benefit the witness has received or will receive, but the witness' belief about what he is getting. To show greater bias, Oliveros must also show that Casanova knew that he faced more severe detention than he admitted. The bias of a witness is a subjective fact influenced by that witness' beliefs about the benefit he will receive if he testifies in a particular way and the value of it to him, which is measured by what he thinks will happen if he does not receive the benefit. A witness cannot be motivated to lie by something which the witness does not think will happen. The absolute truth about what Casanova received from the government and its value does not matter; what Casanova believed about it does.

The proffered expert opinion testimony about the full extent of the detention Casanova would have faced but for the FBI's intervention on his behalf does not show that Casanova knew it. Oliveros argues that the reality about the full benefit of what Casanova received is evidence from which it could be inferred that he knew that reality. In other words, the argument is that the fact Casanova actually faced years of detention (if he did) instead of 90 days is evidence he knew he did. That might be a persuasive argument in some contexts, but not in the particular area of immigration law involved in this case, an area in which the law is unsettled, complex, and confusing. The fact that Oliveros felt compelled to offer expert opinion on how the law operated, instead of asking the court to take judicial notice and instruct the jury accordingly, is an indication that there is no basis for assuming that Casanova or Agent Gruber should have known what Oliveros apparently thought the district court judge did not. Another indication of the same thing is the fact that Oliveros' proffered expert opinion has since been contradicted in substantial part by the Supreme Court.[6] We do not think it reasonable to infer or assume that a confidential informant and his law enforcement handler knew more

_____

[6] In <u>Zadvydas v. Davis</u>, __ U.S. __, 121 S. Ct. 2491 (2001), the Supreme Court held, contrary to what Oliveros' expert would have testified, that the INS could not detain indefinitely an alien ordered removed from this country. Instead, the period for which such an alien could be held is subject to reasonable limitations, and the presumptive limit is six months. 121 S. Ct. at 2505.

18

about the details of a particular area of immigration law than does the district court and the immigration law expert witness proffered by the defense in this case.

## 2. The Alleged Giglio violation

Oliveros also contends that the exclusion of his expert's testimony concerning the actual workings of immigration law and the true length of the detention that Casanova would have faced had he not cooperated and testified let the government anesthesize the jury to the effect of the benefits it gave Casanova by allowing the prosecutor to minimize the significance of them and argue that they were authorized by federal law. Oliveros contends that these misrepresentations violated Giglio v. U.S., 405 U.S. 150, 154, 92 S. Ct. 763, 766 (1972).[7] However, Oliveros's failure to show that Casanova knew he faced more lengthy detention or that the benefits he received were not authorized by law is fatal to his Giglio claim. Without such a showing, any alleged misrepresentations by the prosecutor on the subject are not material.

For Giglio purposes, "the falsehood is deemed to be material 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995) (quoting

---

[7]Giglio involved a prosecutor who knowingly used perjured testimony or failed to correct testimony that was false. In United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995), we applied Giglio to the situation where the prosecutor himself made false representations to the jury.

19

<u>United States v. Agurs</u>, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976)).  Even if

Casanova did  receive more of a benefit than he or Agent Gruber knew, and even if

that benefit was not authorized by law, that does not affect Casanova's credibility

for the reasons we have already discussed.  Accordingly, even if the prosecutor's

statements to the jury were false, they were not material.

AFFIRMED.